[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14630

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 15, 2011
JOHN LEY
CLERK

D.C. Docket No. 5:09-cv-00144-WTH-GRJ

CHRISTIAN COALITION OF FLORIDA, INC.,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 15, 2011)

Before MARCUS, WILSON and COX, Circuit Judges.

MARCUS, Circuit Judge:

Christian Coalition of Fla. ("CC-FL") appeals the district court's dismissal

of its tax refund suit for mootness. Shortly after the litigation began, the Internal

Revenue Service ("IRS") refunded the disputed taxes in full. CC-FL claims, however, that a live controversy still exists because it is also seeking declaratory and injunctive relief in order to obtain a favorable determination of its tax-exempt status. CC-FL claims that the failure of the IRS to recognize CC-FL as a tax-exempt organization has collateral consequences that prevent the tax refund from rendering this case moot.

After thorough review, we AFFIRM the judgment of the district court. Filing a claim for a tax refund suit is not simply a procedural hurdle that, once leapt over, allows a party to seek other forward-looking relief against the IRS after the refund has been granted. Without a live refund claim, there is no way to distinguish this case from the kind of pre-enforcement suits that Congress, through the Anti-Injunction Act and the federal tax exemption to the Declaratory Judgment Act, has expressly forbidden taxpayers from bringing.

## I.

CC-FL is a Florida non-profit corporation, founded in 1990. According to its complaint, CC-FL is an "advocacy organization" that "teaches concern for the sanctity of life, traditional family values, an economic system which fosters individual self-reliance, and faith in God." CC-FL engages in a substantial amount of lobbying and "regularly publishes voter guides and legislative

scorecards."

Because of its lobbying activity, CC-FL could not seek tax exemption as a public charity under 26 U.S.C. § 501(c)(3). Instead, on July 19, 1993, CC-FL applied to the IRS for recognition of tax exempt status as a social welfare organization under 26 U.S.C. § 501(c)(4) and 26 C.F.R. § 1.501(a)-1.[1] Section 501(c)(4) (together with section 501(a)) exempts from taxation non-profit organizations "operated exclusively for the promotion of social welfare." Unlike public charities, social welfare organizations may engage in lobbying and other forms of advocacy. They are not permitted, however, to engage in "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii).

On July 25, 2000, the IRS issued a proposed determination letter denying CC-FL's application. On October 5, 2000, CC-FL filed a letter with the IRS protesting and appealing the proposed determination. Although the IRS and CC-FL held a conference on May 30, 2002 to discuss the proposed determination letter, the matter was put on hold while the IRS and The Christian Coalition

---

[1] An organization cannot obtain tax exempt status merely by conducting itself in accordance with the relevant provisions of the Internal Revenue Code; rather, "[i]n order to establish its exemption, it is necessary that every such organization claiming exemption file an application" with the IRS. 26 C.F.R. § 1.501(a)-1(a)(2).

3

International, an affiliated but separate legal entity, resolved a similar dispute in litigation then pending in the United States District Court for the Eastern District of Virginia.

After that litigation concluded, the IRS issued, via a letter dated July 31, 2008, its final determination that CC-FL did not qualify for tax exempt status under section 501(c)(4). The IRS stated: "We made this determination for the following reasons: You were not primarily engaged in activities that promote social welfare. Your activities primarily constituted direct and indirect participation in political campaigns on behalf of, or in opposition to, candidates for public office." The final determination letter also incorporated in full the earlier proposed determination letter, which discussed at greater length what the IRS viewed as CC-FL's political activities, including publishing voter guides, releasing legislative scorecards right before elections, and conducting grassroots political activism seminars. The proposed determination letter concluded: "The emphasis throughout your materials is on electing to office 'family friendly' people in order to impact legislation and policy as insiders. The overwhelming majority of the evidence in the administrative record, and thus the facts and circumstances in this case, denotes an organization that is intent upon intervening in political campaigns."

4

During the lengthy pendency of its application, CC-FL had filed non-profit information returns, not corporate tax returns, with the IRS. In light of the adverse determination, the IRS instructed CC-FL to file corporate tax returns for all of the tax years in question within 30 days of the final determination letter. CC-FL did so, filing tax returns and making full payments for tax years 1991, 1994-2000, and 2005-2006 on August 27, 2008. CC-FL's tax liability for these years was quite small, ranging from $16 (in 1994) to $48 (in 1997).[2]

On September 25, 2008, CC-FL then filed amended tax returns requesting a full refund for these tax years on the ground that it is a tax exempt social welfare organization under section 501(c)(4). By statute, a taxpayer must wait six months before bringing a tax refund suit. 26 U.S.C. § 6532(a)(1). Within this statutory window, on December 1, 2008, the IRS refunded CC-FL its tax amounts, plus statutory interest, for tax years 2005 and 2006, totaling $68.68. The IRS did not state its reasons for granting the refund.

The IRS did not issue a refund or make a determination within the six

---

[2] In its briefing, CC-FL explains why its tax liability was so small:

> Most of CC-FL's operating budget is acquired in the form of non-taxable gifts excluded from its gross income pursuant to [I.R.C.] section 102. Consequently, CC-FL often has very little, if any, tax liability. For example, for the suit years, CC-FL reported gross receipts in excess of $2,009,700. Of that amount, approximately $1,700 dollars could properly be classified as taxable income, resulting in a tax liability of $261.

month statutory period as to CC-FL's claim for the remaining tax years 1991 and

1994-2000. Accordingly, on April 3, 2009, CC-FL filed the refund suit at issue in

the United States District Court for the Middle District of Florida, seeking a full

refund of $261 for those years. CC-FL also sought a declaration that it qualifies as

a tax exempt organization under section 501(c)(4), an injunction prohibiting the

IRS from revoking CC-FL's tax exempt status, and a declaration that 26 U.S.C. §

501(c)(4) and the accompanying regulations 26 C.F.R. §§ 1.504(c)(3)-1 and

1.504(c)(4)-1 are unconstitutional, both facially and as-applied to CC-FL, for

overbreadth and vagueness.

Shortly after the litigation was filed, the IRS began refunding CC-FL its

claimed tax amounts.[3] The IRS determined that, under 26 U.S.C. §§ 6501(a) and

6501(g)(2),[4] the three year statute of limitations on assessing and collecting taxes

---

[3] There is some dispute about the timing of these refunds. The IRS asserts that almost all of the claimed taxes (with the exception of tax year 1995) were refunded or credited to CC-FL before CC-FL filed suit on April 3, 2009. CC-FL says that it did not receive notice of any these refunds until after it commenced suit. Ultimately, this dispute is of little relevance here. It is undisputed that at least some refunds had not yet been granted at the time CC-FL filed suit, and it is similarly undisputed, therefore, that CC-FL had a live refund claim at the time the suit was filed. And the IRS does not contend that the case was never a live one; rather, it argues only that the case was later rendered moot by its full refund of the claimed taxes.

[4] Section 6501(a) provides that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed." Section 6501(g)(2) provides that if a taxpayer has a good faith basis for believing it is a tax exempt organization and "files a return as such," then this earlier return is the applicable one for purposes of section 6501(a), notwithstanding a later adverse IRS determination. In other words, for purposes of this case, CC-FL's non-profit information returns that it filed for each of the years 1991 and 1994-2000 -- not its later 2008

6

had run for all of the tax years. Accordingly, the IRS treated CC-FL's tax payments for those years as overpayments under 26 U.S.C. § 6401(a).[5] Pursuant to 26 U.S.C. § 6402(a),[6] the IRS first credited CC-FL's payments towards an existing employment tax liability for 2006, and then refunded the rest, sending the final refund check to CC-FL on August 11, 2009.

On August 17, 2009, the IRS moved to dismiss the refund suit for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). The IRS claimed that the refund suit was rendered moot because the refunds sought by CC-FL had been granted in full. The district court agreed, entering an order granting the government's motion and dismissing the complaint with prejudice on August 3, 2010, and entering a separate judgment the following day.

## II.

"A district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is a question of law we review <u>de</u>

---

corporate tax return -- triggered the three year statute of limitations. The taxes were assessed and collected in 2008, well outside the statute of limitations for all of the tax years at issue.

[5] Section 6401(a) provides: "The term 'overpayment' includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto."

[6] Section 6402(a) provides: "In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall . . . refund any balance to such person."

7

novo." <u>Sinaltrainal v. Coca-Cola Co.</u>, 578 F.3d 1252, 1260 (11th Cir. 2009). Similarly, "[w]hether a case is moot is a question of law that we review <u>de novo</u>." <u>Sheely v. MRI Radiology Network, P.A.</u>, 505 F.3d 1173, 1182 (11th Cir. 2007).

**A.**

We begin with a brief discussion of the relevant jurisdictional statutes. The United States, as a sovereign entity, is immune from suit unless it consents to be sued. <u>United States v. Dalm</u>, 494 U.S. 596, 608 (1990); <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976); <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941). "[T]he terms of its consent to be sued in any court," as expressed by statute, "define that court's jurisdiction to entertain the suit." <u>Sherwood</u>, 312 U.S. at 586. Accordingly, the terms of the statute or statutes waiving immunity are construed strictly, and courts may only entertain suits that are in full accord with such statutes. <u>See</u> <u>Soriano v. United States</u>, 352 U.S. 270, 276 (1957) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." (citing <u>Sherwood</u>, 312 U.S. at 590-91)); <u>accord</u> <u>McMaster v. United States</u>, 177 F.3d 936, 939 (11th Cir. 1999).

The primary jurisdictional statute governing judicial review of federal tax decisions is 28 U.S.C. § 1346(a). It provides, in relevant part:

8

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws[.]

28 U.S.C. § 1346(a). Title 26 U.S.C. § 7422, which governs civil actions for tax refunds, requires a taxpayer to first file a claim for a refund or credit with the IRS before he may commence a tax refund suit. See 26 U.S.C. § 7422(a). And 26 U.S.C. § 6532(a)(1) provides that a taxpayer may not bring a suit "under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum . . . before the expiration of 6 months from the date of filing the claim required under such section."

Aside from the statutes describing the affirmative requirements for bringing a tax refund suit, Congress has also expressly excluded from judicial review other types of federal tax disputes. The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, which generally authorizes courts to issue declaratory judgments as a remedy, excludes federal tax matters from its remedial scheme.[7] See Raulerson v.

---

[7] The Declaratory Judgment Act provides:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in

United States, 786 F.2d 1090, 1093 n.7 (11th Cir. 1986) ("Th[e DJA] proscribes judicial declaration of the rights and legal relations of any interested parties in disputes involving federal taxes." (internal quotation marks omitted)).  And the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421, provides that, except for suits brought under a handful of enumerated statutory exceptions, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).

Taking these provisions together, it is clear that, with certain exceptions not applicable here, judicial review of IRS determinations is largely circumscribed to entertaining suits for the refund of already-paid taxes.  See Bob Jones Univ. v. Simon, 416 U.S. 725, 731-32 & n.7 (1974) (noting the "congressional antipathy for premature interference with the assessment or collection of any federal tax" and that the "pressures operating on organizations . . . to seek injunctive relief

---

any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added).

against the Service . . . conflict directly with a congressional prohibition of pre-enforcement tax suits"). Against the backdrop of sovereign immunity, these statutes prescribe the terms of the United States' limited consent to be sued regarding federal tax matters, and accordingly "define th[e] court's jurisdiction to entertain the suit." Sherwood, 312 U.S. at 586.

**B.**

"Article III of the Constitution limits the jurisdiction of federal courts to 'cases' and 'controversies.'" Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998). As we have explained, there are "three strands of justiciability doctrine -- standing, ripeness, and mootness -- that go to the heart of the Article III case or controversy requirement." Harrell v. The Fla. Bar, 608 F.3d 1241, 1247 (11th Cir. 2010) (internal quotation marks and alterations omitted). With regard to the third strand, the Supreme Court has made clear that "a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)); see Harrell, 608 F.3d at 1265. As a panel of this Court has put it, "[a]n issue is moot when it no longer presents a live controversy with respect to which the court can

11

give meaningful relief." Friends of Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1216 (11th Cir. 2009) (internal quotation marks omitted). Moreover, we do not determine questions of justiciability simply by looking to the state of affairs at the time the suit was filed. Rather, the Supreme Court has made clear that the controversy "must be extant at all stages of review, not merely at the time the complaint is filed." Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quoting Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974)).

### 1.

CC-FL contends that the district court erred in concluding that CC-FL could not seek declaratory and injunctive relief after being granted a full refund because of the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act. CC-FL claims those statutes do not apply in post-enforcement refund suits (even when there is no longer a live refund component to the suit), as opposed to pre-enforcement suits filed before the assessment or collection of any tax. CC-FL's theory is that, having jumped through all of the congressionally-mandated hoops by properly filing a refund claim for $261 to unlock the courthouse doors, it may now seek the relief it wanted all along -- declaratory and injunctive relief -- even when the $261 is no longer at issue.

The government responds that this case has become moot, noting that the

tax refund relief CC-FL seeks has been granted, and that there is no longer any amount at issue for the suit years. The government points out that it was required by statute to credit or refund the taxes at issue because the three-year collection and assessment period had run. The government also notes that, as a general matter, a refund suit for particular tax years decides only the tax liability for those years, and not for future years. The government contends that CC-FL cannot maintain this action simply as a vehicle to preemptively obtain favorable tax status for future years. Forward-looking claims of this kind, the government argues, are barred by the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act.

The government has the better of the argument. Although neither the Supreme Court nor this Circuit has squarely addressed whether declaratory and injunctive relief are available in the context of a tax refund suit, the leading case on the application of the Anti-Injunction Act is <u>Bob Jones Univ. v. Simon</u>, 416 U.S. 725 (1974). In <u>Bob Jones</u>, the Supreme Court made clear that the AIA prohibits courts from entertaining pre-enforcement suits challenging the IRS's assessment or collection of federal taxes.[8] The Court held that filing these

---

[8] While the Supreme Court did not directly apply the DJA, it observed: "There is no dispute, however, that the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act. Because we hold that the instant case is barred by the latter

13

forward-looking suits, as opposed to paying the taxes arising from the dispute, then claiming a refund, was contrary to the clear terms of the AIA preventing courts from entertaining any "suit for the purpose of restraining the assessment or collection of any tax." Id. at 736 (quoting 26 U.S.C. § 7421(a)). The Court noted that although the AIA "apparently has no recorded legislative history," id., its "principal purpose" is "the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in a suit for refund.'" Id. at 736-37 (quoting Enochs v. Williams Packing and Navigation Co., 370 U.S. 1, 7 (1962)).

The facts and procedural posture of Bob Jones are instructive. Bob Jones University, located in Greenville, South Carolina, is a private Christian university. See id. at 734-35. At the time of the Supreme Court's decision, the University refused to admit African-Americans as students and prohibited its students from interracial dating. Id. at 735. Although the University had been granted tax-exempt status back in 1942 under a predecessor of what is now 26 U.S.C. § 501(c)(3), in 1970 the IRS announced that it would no longer allow tax-exempt

---

provision, there is no occasion to resolve whether the former is even more preclusive." Bob Jones, 416 U.S. at 732 n.7.

14

status for schools maintaining racially discriminatory admissions policies.[9]  Id.
Before the IRS could take official action, Bob Jones University filed suit seeking declaratory and injunctive relief to prevent the IRS from revoking the University's tax-exempt status.

The Supreme Court recognized the substantial consequences revocation of tax-exempt status can have on a 501(c)(3) organization and the powerful incentives such organizations have to bring suits seeking declaratory and injunctive relief.  Id. at 731.  Nonetheless, the Supreme Court recognized that these "pressures operating on organizations facing revocation of § 501(c)(3) status to seek injunctive relief against the Service pending judicial review of the proposed action conflict directly with a congressional prohibition of such pre-enforcement tax suits."  Id.  The Supreme Court went on to observe that the University could obtain review by paying income or employment taxes in full, and then bringing a suit for a refund.  Id. at 746-47.  The Court conceded that the

---

[9] Title 26 U.S.C. § 501(c)(3) is the provision of the Internal Revenue Code that grants tax-exempt status to public charities.  Notably, donations to 501(c)(3) organizations are tax-deductible, unlike donations to 501(c)(4) organizations (the section at issue in this case).  Accordingly, revocation of 501(c)(3) status for a charity "is likely to result in serious damage to a charitable organization," because "[m]any contributors simply will not make donations to an organization that does not appear on the Cumulative List [the IRS' official list of approved 501(c)(3) organizations]."  Bob Jones, 416 U.S. at 730.  Unless they have a strong attachment to the organization in question, individuals seeking to make tax-deductible charitable donations will simply divert their largesse elsewhere in the event an organization loses its 501(c)(3) status.

15

government's interest in protecting the administration of the federal tax system from judicial interference can often lead to imperfect and harsh results for an organization that has a dispute with the IRS:

> We do not say that these avenues of review are the best that can be devised. They present serious problems of delay, during which the flow of donations to an organization will be impaired and in some cases perhaps even terminated. But, as the Service notes, some delay may be an inevitable consequence of the fact that disputes between the Service and a party challenging the Service's actions are not susceptible of instant resolution through litigation. And although the congressional restriction to postenforcement review may place an organization claiming tax-exempt status in a precarious financial position, the problems presented do not rise to the level of constitutional infirmities, in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference, and of the opportunities for review that are available.

Id. at 747-48 (citations omitted).

Finally, in a footnote on which CC-FL heavily relies, the Supreme Court emphasized that the University did not bring its case as a refund action. The Court stated that "we have no occasion to decide whether the Service is correct in asserting that a district court may not issue an injunction in such a suit, but is restricted in any tax case to the issuance of money judgments against the United States." Id. at 748 n.22. The Court also noted that "there would be serious question about the reasonableness of a system that forced a § 501(c)(3)

16

organization to bring a series of backward-looking refund suits in order to establish repeatedly the legality of its claim to tax-exempt status and that precluded such an organization from obtaining prospective relief even though it utilized an avenue of review mandated by Congress." Id.

CC-FL attempts to distinguish Bob Jones by claiming that the AIA and DJA only apply to  suits seeking purely declaratory and injunctive relief, filed before any tax was assessed or collected.  CC-FL argues that this case is different, because it met all of the jurisdictional and statutory requirements for a refund suit, and that this case falls into the scenario expressly left unresolved by the Supreme Court in Bob Jones: a tax refund suit in which the claimant also seeks declaratory and injunctive relief.

Absent a live refund claim, however, CC-FL's attempt to distinguish this case from Bob Jones is unavailing.  While CC-FL wanted to obtain its refund on the most favorable grounds possible, a refund is a refund, and the IRS returned all of the disputed taxes shortly after this litigation began.  We need not decide today the still-unresolved issue of whether, in a live refund suit, a court may also award declaratory and injunctive relief.  It is enough to say that, regardless of this case's origins as a tax refund suit, absent any live refund component, the district correctly concluded that it was without jurisdiction to entertain a suit containing solely

17

forward-looking claims seeking declaratory and injunctive relief from the IRS. These types of suits are expressly proscribed by the DJA and AIA.

The congressional response to Bob Jones is also instructive, and favors the government's position here. Congress recognized the potential harshness of the Supreme Court's holding for 501(c)(3) charities that might lose virtually all of their donations, and responded to the "serious question" raised by forcing 501(c)(3) charities to repeatedly file backward-looking refund suits. Accordingly, in 1976, Congress enacted 26 U.S.C. § 7428, which, in relevant part, permits the United States Tax Court, the United States Court of Federal Claims, or the United States District Court for the District of Columbia to entertain declaratory judgment actions "with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3)." 26 U.S.C. § 7428(a); see Tax Reform Act of 1976, Pub. L. No. 94-455, § 1306, 90 Stat. 1520 (1976).[10]

Notably, however, Congress did not enact any exception to the Declaratory Judgment Act or Anti-Injunction Act for organizations seeking tax-exempt status under other provisions of section 501(c), including for organizations like CC-FL

---

[10] In this vein, Congress also amended the DJA, 28 U.S.C. § 2201, to carve out an exception (to the broader federal tax exception) for suits brought under 26 U.S.C. § 7428.

seeking tax-exempt status as a social welfare organization under section 501(c)(4). We find this distinction meaningful, and decline to read additional remedies into the legislative scheme chosen by Congress. "Where Congress has provided a comprehensive statutory scheme of remedies, as it did here, the interpretive canon of expressio unius est exclusio alterius applies." Christ v. Beneficial Corp., 547 F.3d 1292, 1298 (11th Cir. 2008); accord Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1171 n.15 (11th Cir. 2003). The principle of expressio unius simply says that when a legislature has enumerated a list or series of related items, the legislature intended to exclude similar items not specifically included in the list. See United States v. Castro, 837 F.2d 441, 442 (11th Cir. 1988) ("A general guide to statutory construction states that the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius.") (internal quotation marks omitted). Thus, it is clear that Congress has granted organizations claiming 501(c)(4) tax-exempt status fewer avenues for judicial relief than those organizations seeking 501(c)(3) status.

**2.**

CC-FL also contends that the case is not moot because it seeks more than the mere refund of $261 in federal taxes, and that collateral consequences result from the failure of the IRS to issue a favorable determination letter. CC-FL lists

three primary consequences that, it claims, warrant further relief: (1) "CC-FL is deprived of the advance public recognition of its exempt status for future tax years," and must instead continue to file federal corporate tax returns; (2) "donors are less likely to contribute to an organization treated as a for-profit corporation by the [IRS] rather than one recognized as exempt from federal income taxes"; and (3) CC-FL will have to pay state taxes because "Florida state tax liability is controlled by its federal tax status." See Fla. Admin. Code r. 12-12C-1.022(1)(e).[11]

We are not persuaded. These consequences do not allow us to carve out an exception to the unambiguous prohibitions found in the Anti-Injunction Act and Declaratory Judgment Act. In the first place, we have no power to rewrite the language of these statutes. United States v. Blue Cross and Blue Shield of Ala., Inc., 156 F.3d 1098, 1111 (11th Cir. 1998) ("When the language of a statute is

---

[11] Fla. Admin. Code r. 12-12C-1.022(1)(e) provides, in relevant part:

> Any nonprofit or other tax-exempt organization, including a private foundation, which is exempt from federal income tax under Section 501(a), I.R.C., and is described in Section 501(c), I.R.C., is required to file a Form F-1120 [Florida corporate income tax return] only when such organization has "unrelated trade or business taxable income," as determined under Section 512, I.R.C., or is filing a Form 990T with the Internal Revenue Service.

(emphasis added). In other words, as a general matter, organizations recognized by the IRS as tax-exempt do not have to file state corporate tax returns in Florida.

unambiguous, we are bound to give it its plain meaning . . . ."); see also Bob Jones, 416 U.S. at 750 ("Congress . . . is the appropriate body to weigh the relevant, policy-laden considerations" of permitting not-for-profit organizations to obtain preventative injunctive relief against the IRS) (emphasis added).

Moreover, CC-FL's arguments prove far too much. As for CC-FL's future federal and state tax liabilities, if those were sufficient to permit the district court to retain jurisdiction over the suit, then the limitations found in the Anti-Injunction Act and Declaratory Judgment Act would be rendered meaningless. Any taxpayer denied tax-exempt status will have to pay federal and state taxes going forward. If we were to adopt the rule urged by CC-FL, then all adverse IRS determinations regarding an organization's claim to tax-exempt status would be susceptible to challenge in federal district court.

The Supreme Court's discussion in Bob Jones also highlights the weakness of CC-FL's claim that it would suffer reduced donations if denied declaratory or injunctive relief. Donations to 501(c)(3) charities -- unlike those to 501(c)(4) organizations that engage in lobbying activity -- are generally tax deductible, see 26 U.S.C. § 170, meaning that revocation of an organization's 501(c)(3) status will likely result in a massive drop in donations to that organization, as donors seeking favorable tax treatment make contributions elsewhere. Presumably recognizing

21

this distinction, CC-FL instead says that donors will have more "peace of mind" in donating to a 501(c)(4) organization because those potential donors can rest assured that the organization will not use those donations for the "private inurement" of its members. See 26 U.S.C. § 501(c)(4)(B). But if the severe consequences of losing tax exempt status for a 501(c)(3) organization, even the potential "ruination of the taxpayer's enterprise," were deemed by the Supreme Court insufficient reason to carve out an exception to the AIA, see Bob Jones, 416 U.S. at 745, 747, then CC-FL's far more modest claim would seem to be plainly insufficient to avoid the clear terms of the AIA and DJA.

CC-FL's collateral consequences argument is, at best, an incomplete attempt to satisfy the narrow judicially-created exception to the Anti-Injunction Act. In Enochs v. Williams Packing, the Supreme Court held that a taxpayer may seek preventative injunctive relief against the IRS only upon satisfying two independent prongs: first, that he will suffer "irreparable injury" if not awarded injunctive relief, and second, "that under no circumstances could the Government ultimately prevail." 370 U.S. at 6-7. CC-FL's claim of collateral consequences bears solely on the first prong of the Williams Packing test. The Supreme Court has made clear, however, that a taxpayer must establish both prongs of the judicial exception to the Anti-Injunction Act before a court may entertain his claim for

22

injunctive relief against the IRS.  See Alexander v. "Americans United" Inc., 416 U.S. 752, 762 (1974) ("[A]llowing injunctive relief on the basis of this showing [of irreparable injury] alone would render [the Anti-Injunction Act] quite meaningless."); accord Bob Jones, 416 U.S. at 745 ("Williams Packing switched the focus of the extraordinary and exceptional circumstances test from a showing of the degree of harm to the plaintiff absent an injunction to the requirement that it be established that the Service's action is plainly without a legal basis.").  And CC-FL has not shown, or even argued, that the IRS's adverse determination is plainly without a legal basis or that under no circumstances could the IRS prevail. In short, the collateral consequences advanced by CC-FL do nothing to undermine the conclusion that this suit was rendered moot upon the full refund of taxes by the IRS.

## C.

CC-FL's final claims are drawn from the judicially-created exceptions to the mootness doctrine.  CC-FL first contends that even if the full refund of taxes would ordinarily render a refund suit moot, this case falls under the exception to the mootness doctrine governing cases or controversies "capable of repetition yet evading review."  "[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable

23

showing that he will again be subjected to the alleged illegality." City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983) (citing DeFunis v. Odegaard, 416 U.S. 312, 319 (1974)).  As the Supreme Court has made clear, the exception applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" Davis v. FEC, 554 U.S. 724, 735  (2008) (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)); see also Bourgeois v. Peter, 387 F.3d 1303, 1308 (11th Cir. 2004).

The first prong of the exception -- that the challenged action is too short to be fully litigated -- is not met here.  Nothing about the IRS's adverse determination or assessment and collection of taxes is "too short to be fully litigated."  Every year in which CC-FL pays taxes, it may claim a refund, and, should the IRS fail to provide the refund within the six month statutory period, CC-FL may file a refund suit and obtain full judicial review of the dispute.  As the Supreme Court has noted, "[t]hese review procedures offer petitioner a full, albeit delayed, opportunity to litigate the legality of the Service's revocation of tax-exempt status and withdrawal of advance assurance of deductibility." Bob Jones, 416 U.S. at 746.  CC-FL says that it is too easy for the IRS to simply refund the taxes, either within the six month statutory period or shortly after litigation begins,

24

but that complaint does not fit within the narrow exception to mootness for cases "evading review." Rather, it is a complaint that the congressional scheme for challenging adverse determinations by the IRS is too limited. However inequitable or frustrating CC-FL may find this statutory scheme, the Supreme Court has made clear that "the problems presented do not rise to the level of constitutional infirmities." Id. at 747. Accordingly, we decline to use this exception to the mootness doctrine to create an end-run around the AIA and DJA.

Nor is the second prong of the exception -- a reasonable expectation that the complaining party will be subject to the same action in the future -- met here. It is true, if stated broadly enough, that this case involves an issue (CC-FL's tax exempt status) that is likely to arise in future years yet may never be fully considered by a federal court (because in a given year, CC-FL may incur no tax liability, or the IRS may choose to refund the inevitably small amount of CC-FL's claim within the six month statutory window rather than litigate, as it did with respect to the 2005 and 2006 tax years). But a proper framing of the issue raised in this litigation is a narrower one.[12] The issue is not whether CC-FL is a tax-

---

[12] Moreover, even if we frame the issue broadly, CC-FL still cannot meet the first prong of the mootness exception for cases capable of repetition yet evading review, because the IRS's adverse determination and demand for taxes in any given tax year are not too short in duration to be fully litigated.

exempt organization, now and in the future, but rather whether it was entitled to a refund for the past tax years 1991 and 1994-2000. "Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action." Commissioner v. Sunnen, 333 U.S. 591, 598 (1948). And as the Supreme Court has said, "there must be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." Murphy v. Hunt, 455 U.S. 478, 482 (1982) (emphasis added) (internal quotation marks omitted). The same controversy -- CC-FL's tax liabilities for the years 1991 and 1994-2000 -- is not an issue capable of repetition. Rather, the hypothetical future controversy advanced by CC-FL would be at most a similar one. The tax amounts in dispute and the nature of the claim for a refund are specific to each individual tax year. Sunnen, 333 U.S. at 598. Similarly, the proper resolution of CC-FL's claim to tax-exempt status in a given tax year will depend on CC-FL's conduct in that year. Thus, for example, the IRS or the district court would have to determine whether, in the specific tax year at issue, CC-FL has engaged in "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii).

CC-FL's second claim is that the IRS has voluntarily ceased its unlawful

26

conduct by refunding the taxes at issue, and that its voluntary cessation in response to this litigation does not render the case moot.  We recently discussed the "voluntary cessation" exception to mootness in Harrell v. The Fla. Bar, noting that "it has long been the rule that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."  608 F.3d at 1265 (internal quotation marks and alteration omitted).  When a party abandons a challenged practice voluntarily, the party alleging mootness -- here, the IRS -- bears the burden of demonstrating that the wrongful activity is not likely to recur.  Id.  The burden requires a showing that: "(1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  Id. (quoting Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979)).

While CC-FL rightly calls this a "heavy burden," see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000), it fails to recognize that the predicate condition has not been satisfied here.  In refunding the amounts at issue in this case, the IRS did not abandon its practice or position -- voluntarily or otherwise -- that CC-FL is not a tax-exempt organization and that CC-FL should have paid corporate income taxes for the years at issue in the suit.

Rather, the IRS was required by statute to credit or refund the taxes at issue because the three year statutory period for assessing and collecting those taxes had run.  See 26 U.S.C. §§ 6401(a), 6402(a), 6501(a), 6501(g)(2).  As the IRS points out, CC-FL's refund was not granted in response to pending litigation, "but rather was compelled by the operation of the Internal Revenue Code."[13]

The order and judgment of the district court dismissing this case as moot are AFFIRMED.

---

[13]  This point also highlights the possibility that, should a similar dispute over CC-FL's tax exempt status arise in a future tax refund suit, the "voluntary cessation" exception to mootness may have a role to play if the IRS fails to refund the disputed taxes within the six month statutory period, and then later refunds the taxes after litigation begins, solely to deprive the court of jurisdiction and without any independent basis for granting the refund.  We offer no opinion on the merits of a voluntary cessation claim presented under such circumstances, as those circumstances do not describe the case currently before us.