[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15411
Non-Argument Calendar

_____

D.C. Docket No. 1:11-cv-00093-WLS

AMANDA DELOACH SLAPPEY,
Individually and as Administratrix of the
Estate of John Mark Slappey and as
Mother and Next Friend of SAS, a minor child.,

Plaintiff - Appellant,

versus

UNITED STATES ARMY CORPS OF
ENGINEERS,

Defendant,

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 9, 2014)

Before MARCUS, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Amanda Slappey appeals from the district court's dismissal of her complaint against the United States raising negligence claims under the Federal Torts Claims Act ("FTCA") and the Suits in Admiralty Act ("SIAA"). Slappey filed suit after her husband, John Mark Slappey, tragically drowned while duck hunting near the Jim Woodruff Lock and Dam in Lake Seminole, a reservoir owned and operated by the United States Army Corp of Engineers ("the Corps"). She says the Corps was negligent for failing to warn her husband of the hazards of hunting near the dam; for failing to keep the lake near the dam reasonably safe for visitors; and for failing to inspect, maintain, and repair a warning sign, buoys, and a life ring. The district court dismissed the complaint, concluding that sovereign immunity protected the United States from suit under the FTCA and the SIAA because the maintenance and placement of safety features near the dam involved an exercise of discretion. On appeal, Slappey argues that: (1) the United States's acts and omissions causing her husband's death were not committed in the exercise of a discretionary function; and (2) the United States's acts and omissions were not the kind of conduct that Congress intended to shield from liability as a discretionary function. After careful review, we affirm.

We "review de novo factual attacks on the existence of subject matter jurisdiction," United States Aviation Underwriters, Inc. v. United States, 562 F.3d 1297, 1299 (11th Cir. 2009), as well as the district court's interpretation and application of the discretionary function exception, Hughes v. United States, 110 F.3d 765, 767 (11th Cir. 1997). In a factual challenge to subject matter jurisdiction -- as opposed to a facial challenge based merely on the allegations in the complaint -- "the district court is not obligated to take the allegations in the complaint as true," but "may consider extrinsic evidence such as deposition testimony and affidavits." Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169 (11th Cir. 2011) (quotation omitted), cert. denied, 132 S. Ct. 2379 (2012). In such a case, the plaintiff bears the burden of proving that jurisdiction exists, i.e., that the discretionary function exception does not apply. OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002).

"The United States, as a sovereign entity, is immune from suit unless it consents to be sued." Christian Coal. of Fla., Inc. v. United States, 662 F.3d 1182, 1188 (11th Cir. 2011). The FTCA waives that immunity for the torts of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C § 1346(b)(1). But suits premised

on a government employee's exercise of discretion are excepted from the FTCA's waiver of immunity. 28 U.S.C. § 2680(a). The statute provides:

> The provisions [of the FTCA] shall not apply to . . . [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Id. The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). We've said the discretionary function doctrine applies to the SIAA too. Cranford v. United States, 466 F.3d 955, 958 (11th Cir. 2006).

The Supreme Court has created a two-part test for assessing whether a government employee's actions constitute a discretionary function: (1) that the action must involve an element of "judgment or choice"; and (2) if it does, "whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz v. United States, 486 U.S. 531, 536 (1988). Here, Slappey challenges how the Corps dealt with heavy flooding and resulting issues in the Jim Woodruff Dam area. Specifically, she says that in response to the heavy flooding, the Corps had raised the spillway gates at the dam to allow more water to

4

be discharged from the upstream pool to the lower pool.  In so doing, says Slappey, the Corps created an extremely hazardous and powerful current, and that current carried her husband through the dam's raised gates.  Slappey also claims that for ten days before her husband's death, the Corps failed to repair the buoy line in front of the dam that was down and no longer served as a physically restrictive barrier.  Thus, as Slappey concedes, the conduct at issue involves whether any controlling statute, regulation, or policy mandated that the Corps warn of hazards and maintain the area adjacent to the dam in a particular fashion.

Under step one of the discretionary function test, we must assess whether the Corps's conduct violated a specific nondiscretionary mandate that allowed no judgment or choice.  Autery v. United States, 992 F.2d 1523, 1526-28 (11th Cir. 1993).  "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." United States v. Gaubert, 499 U.S. 315, 322 (1991) (quotation omitted).

Here, Slappey identifies no statute requiring particular upkeep or safety features at the dam.  Rather, Congress has given the Corps broad authority over it. In the Rivers and Harbors Act of 1946, Congress provided that "the following works of improvement of rivers, harbors, and other waterways," including the Jim Woodruff Dam, "are hereby adopted and authorized to be prosecuted under the

direction of the Secretary of War and the supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated." Pub. L. No. 79-525, 60 Stat. 634, 634-35 (1946). Congress also has given the Corps broad discretion to manage its navigational civil works, including the Lake Seminole Project. See, e.g., 33 U.S.C. § 1 (authorizing the Army to "prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement").

In the absence of a congressional directive, Slappey offers several manuals, engineering regulations and pamphlets. The Corps's Sign Standards Manual ("SSM") highlights the discretion that local Corps officials retain in determining the site-appropriate combination and placement of warning signs and aids to navigation, such as buoys, lights or alarms. The SSM says, for example, that the Corps policy is "that restricted areas and other hazards at our locks and dams and other waterway facilities may use a combination of buoys and dayboards with the USCG ATON symbol as the primary marking system." It also provides that "[i]t is the responsibility of the staff at each project, in coordination with the Sign Program Manager and consistent with this manual, to determine the most effective mix of buoys, dayboards, and Corps signs." The SSM says that local officials must

determine the appropriateness of an individual sign for a given setting "on a case-by-case basis," based on "geography, hazards, audience, traffic, and the uses for each site."  The SSM also notes that the placement and sizing of water-viewed signs, like the one atop the dam, "is extremely difficult," and depends on factors like "[v]arying water flow, fluctuating river widths, structural obstacles, extreme light conditions and unpredictable viewing situations."

Slappey argues, however, that the Corps's Operational Management Plan ("OMP") for the Lake Seminole Project contains more specific directives.  The OMP provides that "[d]angerous situations that will affect visitor movement on the project (washouts, low water hazards, etc.) will be barricaded, fenced, or marked with the appropriate navigational warning marker as soon as the problem is known."  Slappey says the powerful current and "broken buoy line" constituted a "[d]angerous situation" within the meaning of the plan.  But as the district court reasoned, OMP § 3.2.1.2.4 separately refers to the areas above and below the dam, where the current is the strongest, as "potentially dangerous areas" to be marked at all times by buoy lines and signs.  Thus, under a plain reading of the entire section, the "[d]angerous situations" requiring quick action refer to "sudden hazards in areas for visitors," like washouts and low water hazards affecting launching and navigation, rather than areas that are always "potentially dangerous" to visitors.

7

In any event, as Slappey concedes, the OMP left the Corps "with a range of choices -- barricades, fences, or 'appropriate' warning markers -- as to how to respond to dangerous situations."  The Corps exercised that discretion by marking the dam's hazards with a combination of safety features: a large, water-viewed sign atop the dam, an orange-red buoy line, and dolphins with warning signs and symbols.[1] The Corps also sounds a warning horn before raising or lowering the spillway gates.[2] Plus, even if the sign atop the dam does not comply with current SSM requirements for, inter alia, typeface and font, the Corps followed proper SSM procedures to obtain a waiver based on the combination of safety features in place.  A September 25, 2001 update to the Lake Seminole Sign Plan found these safety features to be "compliant with the current waterway signage guidelines" and that "[t]he current use of U.S. Coast Guard Aids to Navigation system buoys and signs, in addition to dolphins, physical barriers and existing dam signage, [met] current minimum requirements."  See Autery, 992 F.2d at 1530 ("Government liability cannot logically be predicated on the failure of [employees] to go beyond what the operational plans . . . required them to do.") (quotation omitted).

---

[1]    A "dolphin" is a cluster of closely driven piles used as a fender for a dock or as a mooring or guide for boats.

[2]    Slappey also says that the Corps are required to prepare a water control plan alerting "all affected interests to possible hazards from project regulation activities."  33 C.F.R. § 222.5(f)(7). The primary concern of the regulation is "the safety of persons engaged in activity downstream of the facility," not upstream in front of the dam. See id. But to the extent this regulation applies, the Corps has instituted an audible alarm that provides specific warning of the imminent release of water through the gated spillway.

As for Slappey's claim that the local district failed to complete its sign plan, or even its project management plan, that does not bear on the <u>discretionary</u> nature of the Corps' selection of this particular combination of safety features, or its decision to warn visitors away from the dam structure and spillways instead of identifying individual hazards such as currents or undertows, or its judgment of when to repair the buoy line. To the extent she claims that the Corps did not complete documentation of the signage plan at Lake Seminole in a timely fashion, she points to nothing requiring that plan to be completed by any given point. More importantly, she identifies no provision that required the agency to adopt different signage and barriers for the site than the ones that it had adopted. Indeed, Slappey's disagreement with the choices the agency made concerning the signage plan is not relevant to the question of whether the agency had discretion to make the signage decisions that it made. Instead, the question of whether the agency exercised its discretion in developing the signage plan negligently is -- like Slappey's suggestion that the signs selected were too small, not sufficiently specific, or not visible from a distance -- not relevant to the discretionary function inquiry. As we've said, "[o]ur concern under the discretionary function exception is not whether the allegations of negligence are true," but rather, "whether the <u>nature of the conduct</u> involves judgment or choice and whether that judgment is of the kind that the exception was designed to protect." <u>Hughes</u>, 110 F.3d at 767 n.1.

9

Based on this record, we conclude that the district court correctly held that none of the provisions Slappey cited specifically prescribed the Corps's selection, placement, and maintenance of safety features at the dam.  See OSI, 285 F.3d at 952 (holding that "an agency manual which provides only objectives and principles for a government agent to follow does not create a mandatory directive"); Autery, 992 F.2d at 1528-29 (holding that an unwritten policy requiring "that employees 'make every effort within the constraints of budget, manpower, and equipment available to recognize and report' hazardous trees" did not create a mandatory directive).  Slappey has failed to meet part one of the discretionary function test.

At the second step of the discretionary function test, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."  Berkovitz, 486 U.S. at 536. The exception is intended to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  Id. (quotation omitted).  In addressing this question, we must "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one we would expect inherently to be grounded in considerations of policy."  Autery, 992 F.2d at 1530-31 (quotation omitted).  If the policy or

guideline allows for discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324.

Here, the Corps' decisions about the appropriate safety features for the dam, and the placement of those features, implicated many policy considerations. As the record shows, the Corps decided to retain the existing warning sign attached to the railing of the walkway/platform on top of the dam and to construct the dolphin and buoy system with warning signs posted on the dolphins. In so doing, the Corps considered and rejected other alternatives, based on engineering, cost, functionality, efficacy and safety considerations, such as a potential interference with commercial navigation and recreational boating or the risk that a proliferation of warnings could reduce their effect on the public. The decision of when to repair the buoy line segment also required the Corps to balance competing policy considerations, including the risk to visitor safety in delaying repair of the buoy line break, versus the risk of sending employees to attempt repairs under dangerous river conditions. In other words, the Corps' decisions at issue "reflect the kind of judgment that the discretionary function exception is designed to shield." OSI, Inc., 285 F.3d at 953 (Military's disposal of waste on a base "weigh[s] environmental policies against security and military concerns"); see also Cranford, 466 F.3d at 960 (Coast Guard's decisions on marking and removing a submerged wreck implicate "the knowledge and customs of international mariners, balancing the

needs of pleasure and commercial watercraft, and evaluating agency resource constraints, [including] financial concerns"); Mid-South Holdings Co., Inc. v. United States, 225 F.3d 1201, 1207 (11th Cir. 2000) (Customs Service search of a vessel involves balancing "overarching goal of locating contraband with such concerns as efficiency and the minimization of intrusion on the privacy and property interests of searched parties"); Autery, 992 F.2d at 1531 (Park Service's tree inspection procedure likely involved consideration of "risk of harm from trees in various locations, the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available"). Indeed, we've repeatedly held that an agency's decision whether to warn, and how to warn, implicates policy concerns for purposes of the discretionary function analysis. See, e.g., Aviation Underwriters, 562 F.3d at 1300 (decision whether to warn pilots of severe clear air turbulence); Monzon, 253 F.3d 572 (decision whether to warn of rip currents). Moreover, we fail to agree that our case law is inapplicable based on Slappey's view that the Corps's negligence -- rather than heavy flooding -- caused strong currents, since this argument adds another layer of agency decisionmaking to the discretionary function analysis.

To the extent Slappey claims the decision when to repair the buoy line constituted "routine maintenance," the record indicates that the reattachment of buoy cables and dolphins in turbulent water was not routine maintenance, and that

12

the decision to postpone repair was not based solely on cost and involved competing safety considerations. In any event, an agency may take into account "economic" considerations along with other concerns in determining how to exercise its discretion. E.g., Gaubert, 499 U.S. at 323; see also Varig Airlines, 467 U.S. at 820 (determining how "best [to] accommodate[] the goal of . . . safety and the reality of finite agency resources" involves exercise of policy judgment).

Further, Slappey's argument that the "design" of the dam's existing safety features is susceptible to policy analysis, while the Corps' "implementation of these 'safety precautions' is not," resurrects the discredited distinction between "planning" and "operational" levels of decisionmaking. See Gaubert, 499 U.S. at 323, 325, 333; see also Cranford, 466 F.3d at 959 (plaintiffs "would have us rule that the discretionary function exception does not apply to the execution of a governmental decision, but this argument merely restates the operational conduct distinction rejected in Gaubert"). Gaubert similarly forecloses Slappey's argument that the discretionary function bar does not apply to "matters of scientific and professional judgment -- particularly related to judgments concerning safety." The Supreme Court has expressly held that "challenged actions [do not] fall outside the discretionary function exception because they involved the mere application of technical skills and business expertise." Gaubert, 499 U.S. at 331.

In short, Slappey has failed to meet her burden of showing that the Corps's actions concerning the Jim Woodruff Dam did not amount to a discretionary function. [3]    Accordingly, the district court did not err in concluding that sovereign immunity protected the United States from Slappey's claims.

**AFFIRMED.**

---

[3]    In reaching this conclusion, we are unconvinced by Slappey's reliance on out-of-circuit cases that are inapposite here.