Julie TOWBIN, Plaintiff,

v.

Peter ANTONACCI, et al., Defendants.

Case No. 12–80069–CV. `

United States District Court,
S.D. Florida.

Aug. 7, 2012.

James Kellogg Green, James K. Green, West Palm Beach, FL, Randall C. Marshall, American Civil Liberties Union Foundation of Florida, Miami, FL, for Plaintiff.

Charles M. Fahlbusch, Attorney General Office, Fort Lauderdale, FL, for Defendants.

#### *ORDER*

KATHLEEN M. WILLIAMS, District Judge.

In 2011 according to the allegations set forth in the verified complaint initiating this proceeding—Plaintiff Julie Towbin was invited to attend a local political event organized by the Palm Beach County Democratic Executive Committee. (Compl. ¶ 9.) As a former Page in the United States House of Representatives, Ms. Towbin professes a keen and abiding interest in politics. (Compl. ¶ 7.) However, at an entry price of $150 and being only seventeen at the time, Ms. Towbin was concerned that her purchase of a ticket to attend the event would violate Section 106.08 of the Florida Statutes, which prohibits political contributions by minors of more than $100 to individual candidates or political organizations.

More specifically, the statute provides that "an unemancipated child under the age of 18 years of age may not make a contribution in excess of $100 to any candidate or to any political committee supporting one or more candidates." Fla. Stat. § 106.08(1)(a)-(b). The limit for others, including adults, is $500. *Id.* § 106.08(1)(a) ("Except for political parties or affiliated party committees, no person, political committee, or committee of continuous existence may, in any election, make contributions in excess of $500 to any candidate for election to or retention in office or to any political committee supporting or opposing one or more candidates."). A single unlawful contribution is classified as a first degree misdemeanor, while making multiple such contributions is punishable as a third degree felony. *Id.* § 106.08(7)(a)-(b).

When Ms. Towbin asked if she was constrained by the law, the Defendants refused to provide an "advisory opinion," although the State's Attorney General informed her that the statute "remains applicable" and carries criminal penalties. (Compl. ¶¶ 16, 18, 20–21.) The State has not subsequently disavowed the contention that it would enforce the statute against minors making excess political contributions. Ultimately, Ms. Tobin did not attend the political event, but steadfastly holds on to a "definite, and serious, desire and intention to contribute in excess of $100 to a political committee and/or candidates of her choice in 2012" were it not for the criminal penalties she faces. (Compl. ¶ 25.) Consequently, Ms. Tobin (through her mother and next friend) brought suit against the State Attorney and members of the Florida Elections Commission, claiming that unless the statute is declared unconstitutional, she will be deprived of significant First Amendment rights. (Compl. ¶ 29.)

In this motion for a preliminary injunction (DE 5), Plaintiff argues that the cap on contributions by unemancipated minors violates the First Amendment's protection of free speech and association, both on its face and as applied to her. The State does not dispute that the statute infringes at least somewhat on rights secured by the First Amendment. Instead, the State argues that the law is constitutionally permissible in that it prevents wealthier minors from expressing themselves more than others of modest means; it, like campaign contribution laws generally, reduces the risk of political corruption; and it prevents minors from being used as straw contributors by their guardians to circumvent contribution limits applicable to adults. Further, and to achieve these legitimate interests, the State argues that the regulation is closely drawn to avoid

unnecessary abridgement of speech rights and associational freedoms.

The State contends that the following facts are sufficient to justify the intrusion. First, without citing any legislative history (indeed, it was conceded at oral argument that there is none), it contends that the Florida legislature enacted the law because it felt that corruption was a threat.[1] Second, it relies upon a state grand jury report (DE 12, at 20, 25, 27) commissioned in 2010 (and post-dating the law by nearly two decades) that found that Florida had the most convictions of public officials on corruption charges in the country and noted "66 cases relating to violations of F.S. 106.19 (excessive contributions, false reports, fail[ure] to report)" and 13 cases involving other provisions of the statute at issue here (i.e., making a contribution in another's name). Significant to the discussion below, the grand jury report, while speaking to corruption generally, neither commented on the harm posed by excessive contributions by minors nor the use of minors as conduits.

Third, and presumably the source of the violations recognized in the grand jury report, the State points to consent decrees from actions brought by the Florida Elections Commission to show that individuals and companies in Florida conceded making contributions in the name of others in violation of Section 106.08(5). In one case, for instance, a computer component distributor reimbursed several employees for contributions made in the 1996 mayoral race in Miami, Florida. (DE 12 at 81.) The distributor stipulated to making excess contributions and to making contributions through another (in violation of Sections 106.08(1) and (5) of the Florida Statutes). (*Id.* at 85.) In another case, a consent decree recognized that a non-partisan committee called the Florida Leadership Coalition funneled money sent

---

1. The record reveals only that this portion of the statute was enacted in 1991 and that previous limits had ranged from $1,000 to $3,000, as is reflected in House Bill 2251 and codified at Chapter 91–107 of the Laws of Florida. While the subsection at issue here has not been the subject of a judicial challenge, other aspects of the contribution law were invalidated in *Florida Right to Life, Incorporated v. Lamar*, 273 F.3d 1318 (11th Cir. 2001). There, the Eleventh Circuit held that the subject provision of the statute, which provided that "[c]andidates ... may not ... make contributions to any religious, charitable, civic, or other causes or organizations established primarily for the public good" save for three limited exceptions, effectively prohibited political candidates from making "almost all spontaneous acts of charitable giving" from their campaign or personal funds. *Id.* at 1321, 1325–26 (quoting Section 106.08 of the Florida Statutes). Because that reading "curtail[s] the ability of many organizations to solicit and receive candidate donations," the Eleventh Circuit held that it was facially unconstitutional as violating the rights of free expression and association, reversing a ruling by the district court that had granted

summary judgment to the defendants. *Id.* at 1325–26, 1329.

> A federal law that imposed a ban on minor contributions, Section 324 of the Federal Election Campaign Act, was invalidated in *McConnell v. Federal Election Commission*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), *overruled in part on other grounds by Citizens United v. Federal Election Commission*, 558 U.S. 310, 130 S.Ct. 876, 913, 175 L.Ed.2d 753 (2010), the seminal case on this issue. That decision led the Federal Election Commission to amend its regulations "by removing the prohibitions on contributions by Minors to candidates, and on contributions and donations by Minors to political parties." Federal Election Commission, Contributions and Donations by Minors, 70 Fed.Reg. 5565 (Feb. 3, 2005) (amending 11 C.F.R. § 110.19). And as is discussed in more detail below, while three other states have contribution limits applicable to minors, and many others have alternative legislative schemes for circumscribing minor contributions, none have been the target of a constitutional challenge.

by U.S. Sugar, a Florida company, to the Republican Party of Florida in 1994. *(Id.* at 70.) The Coalition acknowledged violating Section 106.08 and agreed to pay a civil fine of $2,500. (DE 12 at 73.) U.S. Sugar acknowledged violating the statute as well and agreed to a civil penalty of $5,000. (DE 12 at 78.) Yet another case involved a hospital in Brevard County that acknowledged asking 74 employees to make $500 contributions to state elections in 1997 and 1998, for which they would be reimbursed. (DE 12 at 88–89, 92–93.) The hospital paid a fine of $4,000. *(Id.)* And in 2001, the Florida Supreme Court issued a 90–day order of suspension for an attorney who "loaned" money to his employees and their family members, as well as his own wife and daughter, who in turn made 37 contributions for $500. *Florida Bar v. Brown,* 790 So.2d 1081, 1083 (Fla.2001). Like the grand jury report, none of these cases specifically involved a minor, was tied to an instance of political corruption by the contributions of a minor, or predated the statute setting a cap on contributions by minors.

Finally, the State cites a law review student note. The note discusses a Los Angeles, California newspaper article that described two instances where children made $1,000 donations to presidential campaigns in 1994 and one where a teenager made a $20,000 contribution to the Democratic Party in 1996, along with other articles reporting similar, unrelated instances of cash contributions by minors. *See* Heather Davis, Note, *Breaking the Piggy Bank: An Alternative Approach to Campaign Contributions by Minors After McConnell v. FEC,* 73 Geo. Wash. L.Rev. 353, 356 n. 26 (2005) (citing Alan C. Miller, *Minor Loophole: Young donors are Increasingly Padding Political Coffers; Officials Fear that Children Are Being Used to Evade Election Laws,* L.A. Times, Feb. 28, 1999, at A1; David Mastio, *The Kiddie–Cash Caper,* Slate Mag. (May 22, 1997, 3:30 AM), http://www.slate.com/id/2446; Michelle Malkin, *"Kid die Cash" Political Gifts Circumvent the Law,* USA Today, Oct. 10, 1996, at A14; Alex Knott, *Members Cash in on Kid Contributions,* Roll Call, June 5, 1995, at A–24; and John Kruger, *Youths 2–17 Follow Parents Lead in Political Contributions,* Hill, Oct. 27, 1999, at 1). The note also references a New York Times article stating that individuals identifying themselves only as "students" contributed $12.2 million over a ten year period at the national level. *Id.* at 354–355 & n. 8 (citing Glen Justice, *Too Young to Vote, Old Enough to Donate,* N.Y. Times, Feb. 10, 2004, at A17). However, neither the note nor its sources reveal that any such event occurred in Florida, that Florida has identified or even prosecuted one situation involving a minor contribution, or that an attendant concern about such contributions motivated Florida's legislature.

The parties have stipulated that this evidence, along with Plaintiff's evidence in the verified complaint, provides the Court with a sufficient basis to address the constitutional issues raised in the instant motion for injunctive relief (DE 18). As is typical in a case of this nature, the most salient question is whether Ms. Towbin can show a likelihood of success regarding whether the statute is unconstitutional. *See, e.g., Ala. Educ. Ass'n v. Bentley,* 788 F.Supp.2d 1283, 1301–02 (N.D.Ala.2011). For the reasons that follow, the Court finds that while Ms. Towbin can establish an impingement of her constitutional rights, the State has not proffered sufficient evidence to demonstrate that the law achieves an important state interest; nor has it shown that the law is sufficiently limited in order to sustain the restriction it imposes on minors' First Amendment rights. After considering the remaining requirements relevant to Plaintiff's motion, the Court

concludes that a preliminary injunction should issue.

## I. PRELIMINARY INJUNCTION STANDARD

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1265 (11th Cir. 2006) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc) (per curiam)). The movant bears the burden of proving an entitlement to an injunction. *Siegel*, 234 F.3d at 1176. This burden is not a light one and the Court is cognizant that "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (citation and quotation omitted). This is particularly true where, as here, the relief sought would be to invalidate a state statute. *See, e.g., Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir.2012) (noting that "[t]he judiciary owes special deference to legislative determinations regarding campaign contribution restrictions." (citations omitted)).

As detailed below, political contributions are a form of political speech that implicate the First Amendment's guarantees of free expression and association. *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (acknowledging that statutory contribution and expenditure limitations "operate in an area of the most fundamental First Amendment Activities"). Even if enacted by individual states, laws limiting individuals' contribution rights are subject to the Constitution's proscriptions embodied in the First Amendment and are unconstitutional if they fail to withstand the level of scrutiny under which they are reviewed. *See Frazier ex. rel. Frazier v. Winn*, 535 F.3d 1279, 1284 n. 4 (11th Cir.2008) ("[T]he First Amendment's prohibition on laws abridging the freedom of speech applies to state governments through the Fourteenth Amendment." (citing *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir.2002))); *Vote Choice Inc. v. DiStefano*, 4 F.3d 26, 31 (1st Cir.1993) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276–77, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Federal courts possess a long-recognized right to issue injunctions necessary to remedy breaches of constitutional rights. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir.2004). Thus, in this context, to obtain a preliminary injunction, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (citing *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004)).

The Court must also consider whether the statute is facially unconstitutional. "When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). As the Eleventh Circuit has recognized:

A facial challenge, as distinguished from an as-applied challenge, seeks to invali-

date a statute or regulation itself. The general rule is that for a facial challenge to a legislative enactment to succeed, the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [a legislative act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.... This heavy burden makes such an attack the most difficult challenge to mount successfully against an enactment.

*Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir.2001) (internal citations and quotations omitted).

 "In the First Amendment context, however, this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (internal citations and quotations omitted); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 797, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (holding that "facial invalidity expresses the conclusion that the statute could never be applied in a valid manner" or is "written so broadly that [it] may inhibit the constitutionally protected speech of third parties."); *Ala. Educ. Ass'n v. Bentley*, 788 F.Supp.2d 1283, 1312 (N.D.Ala.2011) ("[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep."). "[P]articularly where, as here, political speech on matters of public import is implicated, and the statute carries the threat of criminal penalties, courts must protect public debate (and the speakers whose voices inform it) from statutes that would

distort its contours by directly or indirectly discouraging constitutionally protected activities." *Bentley*, 788 F.Supp.2d at 1313; *see also Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) ("[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protection of parties not before the Court for it to be facially challenged on overbreadth grounds." (quoting *City Council of Los Angeles*, 466 U.S. at 801, 104 S.Ct. 2118)). Nonetheless, despite the high standard for an injunction declaring a contribution statute facially unconstitutional, in at least one instance, this Circuit has done just that. *See Fla. Right to Life, Inc.*, 273 F.3d at 1329.

## II. DISCUSSION

### A. Justiciability

 Defendants initially raise a concern about Plaintiff's ability to bring this action insofar as she has not yet violated the law (although she has stated that she intends to do so). Because this contention goes to the justiciability of this action, the Court must resolve this issue before addressing the merits of Plaintiff's claims. *Fla. Right to Life, Inc.*, 273 F.3d at 1322 (evaluating "threshold justiciability issues" before determining constitutionality of campaign finance statute); *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991) ("[E]very federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based."). Article III of the United States Constitution limits the subject matter jurisdiction of federal courts like this one to "cases" and "controversies." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir.2011).

Standing, a requirement under Article III, Section 2 of the Constitution, presents "[p]erhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement," and asks whether there is an injury to the plaintiff personally. *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1273 (11th Cir.2001). This is closely tied to the justiciability doctrine of ripeness, which asks whether the plaintiff's injury currently exists. *See N.C. Right to Life, Inc. v. Leake*, 108 F.Supp.2d 498, 505 (E.D.N.C.2000) ("The State's contention is properly characterized as one relating to ripeness, as the issue is not whether NCRL has properly alleged an injury potentially infringing upon its constitutional rights, but rather whether NCRL is entitled to preenforcement review." (citing Erwin Chemerinsky, *Federal Jurisdiction,* § 2.4, p. 115 (1994))). In a facial challenge grounded in the First Amendment, justiciability requires a plaintiff to provide evidence of an actual or imminent injury, causation, and redressability. *Dermer v. Miami–Dade Cnty.*, 599 F.3d 1217, 1219 (11th Cir.2010) (citations omitted).

In the context of pre-enforcement challenges involving the First Amendment, courts recognize that a less exacting showing is warranted to sustain a challenge. "In an effort to avoid the chilling effect of sweeping regulations, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with these consequences." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir.2003) (collecting authority).

Under Eleventh Circuit precedent, to raise a challenge such as the one presented here, a plaintiff must show that "(1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Am. Civil Liberties Union v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir.1993) (citations omitted). A credible threat of prosecution requires that the plaintiff establish "*first,* that he seriously wishes to engage in expression that is *at least arguably forbidden* by the pertinent law," and "*second,* that there is at least some minimal probability that the challenged rules will be enforced if violated." *Harrell v. Florida Bar*, 608 F.3d 1241, 1260 (11th Cir.2010) (quotations and citations omitted); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir.1999) (stating, in the contribution context, that a statute facially restricting "expressive activity by the class to which the plaintiff belongs" credibly threatens that plaintiff with prosecution and allows him to maintain a pre-enforcement challenge (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996))). In *Harrell,* for instance, the plaintiff was able to show that rules prohibiting advertising conduct had a chilling effect on his speech sufficient to confer standing where he had a "definite[ ]and serious[ ]desire" to engage in conduct prohibited by the rules (by explaining the types of advertising campaigns he envisioned) and "demonstrate[d] how the challenged rules seem to prohibit the ads he wishes to run." *Harrell,* 608 F.3d at 1260 & n. 7.

Applying these principles, the Court is persuaded that Plaintiff can make a sufficient showing, since Defendants' suggestion that Ms. Towbin will either not exercise her rights or that the State will not enforce its penalties is not supported by the record. The plain language of the law criminalizes contributions by unemancipated minors exceeding $100. Ms. Towbin, an unemancipated minor, desires to make an excess campaign contribution in contravention of the law and has sought counsel from Defendants as to whether she would be subject to criminal penalties.

The Defendants do not contest that they would enforce the statute against her or that they have brought charges against others for violations of the statute's other provisions. And, according to the verified complaint, Ms. Towbin is prepared to make such a contribution but for her fear of prosecution. The Court has no reason to doubt her assertion. Accordingly, Plaintiff presents an injury that is redressable by this Court at this time.

Defendants further claim that Plaintiff cannot show an irreparable injury because she will be soon be able to donate $500 to political parties when she turns 18. However, an injury's inherently short duration is hardly an outright bar to justiciability. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury [for

purposes of issuing a preliminary injunction]"). Further, to the extent Plaintiff has presented a cognizable injury, it is undisputed that it existed at the time of filing and at present. *See Sims v. State of Fla., Dept. of Highway Safety & Motor Vehicles,* 862 F.2d 1449, 1458–59 (11th Cir. 1989). In sum, because Plaintiff is able to show that the statute credibly threatens her with prosecution; that she is "chilled" from engaging in protected expression; and that such chilling results in an immediate injury, Plaintiff may proceed on her claim.

### B. Constitutionality of Section 106.08(1)(b)

The heart of Plaintiffs challenge is the constitutionality of Section 106.08(1)(b) of the Florida Statutes. The parties agree that "closely drawn scrutiny" applies to this issue. Campaign contributions—in contrast to expenditure limitations [2]—have

2. This distinction is an important one and merits some attention. As the Supreme Court recently explained after a review of its precedent in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* — U.S. ——, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011), since "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office[,] [l]aws that burden political speech are [] subject to strict scrutiny." *Id.* at 2817 (citations and quotations omitted). However, a line of Supreme Court cases dating back to *Buckley* recognizes the difference between contribution and expenditure laws; limitations on campaign expenditures impede political speech and trigger strict scrutiny, whereas contribution laws only marginally restrict that right and are subject to heightened or "closely drawn" scrutiny. *See McConnell,* 540 U.S. at 134, 124 S.Ct. 619 ("In *Buckley* and subsequent cases, [the Court has] substituted restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions.").

In the landmark case of *Citizens United v. Federal Election Commission,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), the Supreme Court held that corporations cannot be restrained in making independent expenditures for political speech that advo-

cates for or against a candidate for office, invalidating 2 U.S.C. § 441b, as amended by the Bipartisan Campaign Reform Act of 2002. The decision, however, has not affected the standard to be applied here. *See Green Party of Connecticut v. Garfield,* 616 F.3d 189, 199 (2d Cir.2010) ("Although the Court's campaign-finance jurisprudence might be in a state of flux (especially with regard to campaign-finance laws regulating corporations), *Beaumont* and other cases applying the closely drawn standard to contribution limits remain good law."). Recognizing the distinction articulated in *Buckley,* the Supreme Court limited the scope of its decision only to corporate expenditures (and not to direct contributions). *Citizens United,* 130 S.Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny."); *see also Yamada v. Weaver,* 872 F.Supp.2d 1023, 1028, 2012 WL 983559, at *2 (D.Hi. Mar. 21, 2012) (publication forthcoming) ("*Citizens United* did not address whether campaign contributions directly to *candidates* may be limited, and did not change the principle that such restrictions may be justi-

been deemed to only lightly burden individuals' freedom of expression and freedom of association. According to the Supreme Court, expression attendant to contributions "lie[s] closer to the edges than to the core of political expression." *Fed. Election Comm'n v. Beaumont,* 539 U.S. 146, 161, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003); *see also Randall v. Sorrell,* 548 U.S. 230, 247, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (plurality opinion) (quoting *Buckley,* 424 U.S. at 25, 96 S.Ct. 612 for the proposition that "contribution limitations are permissible so long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'"); *Buckley,* 424 U.S. at 20, 96 S.Ct. 612 (stating that contribution laws "entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication."). However, the Supreme Court also recognized that those laws do implicate First Amendment rights and that "contribution restrictions could have a severe impact on political dialogue if they prevent candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley,* 424 U.S. at 21, 96 S.Ct. 612; *Randall,* 548 U.S. at 248, 126 S.Ct. 2479 ("At some point the constitutional risks to the democratic electoral process become too great.").

The Court bridged this tension by applying a "closely-drawn" standard to the analysis. In this context and under that standard, the State must "demonstrate[ ] a sufficiently important interest and employ means closely drawn to avoid unnecessary abridgment" of the freedom encroached upon. *Buckley,* 424 U.S. at 25, 96 S.Ct. 612 (citations and quotations omitted); *see also Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 387–388, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (allowing states to impose campaign contribution limits that are "'closely drawn' to match a 'sufficiently important interest'"). Although described as a rigorous standard in *Buckley,* the Supreme Court has since characterized the Court's role as undertaking a "relatively complaisant review." *Beaumont,* 539 U.S. at 161, 123 S.Ct. 2200; *see also Buckley,* 424 U.S. at 25, 96 S.Ct. 612 (stating that a narrowly drawn and sufficiently important interest can overcome "[e]ven a significant interference with protected rights of political association"). Indeed, applying heightened review, many statutes limiting individual contributions have been found to be inoffensive to the First Amendment, including a $1,000 individual limitation in *Buckley* and a total ban on federal campaign contributions by corporations in *Beaumont.*[3] But, in other circumstances, a $400 limit on individual contributions to

fied to prevent corruption or its appearance."); *Minnesota Citizens Concerned for Life, Inc. v. Swanson,* 741 F.Supp.2d 1115, 1133 (D.Minn.2010) (*"Citizens United* did not overrule *Buckley,* but instead reinforced the distinction between independent expenditures and direct corporate contributions." (collecting authority)).

Thus, it remains the case that limits on individual, independent campaign spending are permissible under the First Amendment if they satisfy the closely drawn scrutiny test. *See McConnell,* 540 U.S. at 231–22, 124 S.Ct. 619 (stating that restrictions on political contributions or donations are valid if they are "closely drawn to match a

sufficiently important [governmental] interest" (quotations omitted)); *Buckley,* 424 U.S. at 52–54, 96 S.Ct. 612. And although identified by Plaintiff to support its position, the Supreme Court's very recent decision in *American Tradition Partnership v. Bullock,* —— U.S. ——, 132 S.Ct. 2490, 183 L.Ed.2d 448 (2012) (per curiam) (publication forthcoming) does not alter this standard.

**3.** The Court in *Beaumont* found significant the fact that corporations were still able to participate in the political process by contributing to a separate segregated fund like a political action committee. 539 U.S. at 161–63, 123 S.Ct. 2200.

a candidate for governor was deemed too low and was invalidated because it harmed the electoral process by magnifying the advantages of incumbents. *Randall,* 548 U.S. at 248–49, 126 S.Ct. 2479. Consequently, rather than fixing an amount as a constitutional floor, this line of precedent has counseled courts to examine the strength of the interests advanced and determine whether those interests can sustain the restriction. *See Shrink Missouri,* 528 U.S. at 391–95, 120 S.Ct. 897; *Buckley,* 424 U.S. at 30, 96 S.Ct. 612.

In this case, the State makes several arguments to justify the infringement on Plaintiff's rights. First, under an anti-distortion theory, it claims that the law prevents a disproportionately excessive amount of speech by wealthier minors. Second, like the justification of contribution laws generally, it asserts that limiting contributions takes the money out of politics and reduces corruption. And finally, focusing on the distinguishing feature of this law—that it uniquely targets minors— the State raises a conduit and child welfare theory of its interests. For each, the Court addresses whether that interest is significant and whether that interest can justify the intrusion at issue here.

### 1. Actuality and Appearance of Corruption

Beginning with *Buckley,* the prevention of the "actuality and appearance of corruption resulting from large individual campaign contributions" is recognized as a significant interest. *See Buckley,* 424 U.S. at 26, 96 S.Ct. 612; *see also Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1987) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances."). This is particularly true where contribution limits are involved. *Randall,* 548 U.S. at 241, 126 S.Ct. 2479 (discussing the *Buckley* decision and noting that the corruption and appearance of corruption rationale "provided sufficient justification for the statute's contribution limitations, but it did not provide sufficient justification for the expenditure limitations").[4]

In other words, recognizing that a close relationship with candidates can support a plausible threat of corruption, "the state's interest in the prevention of corruption— and therefore, its power to impose contri-

---

**4.** The Supreme Court's decision in *Citizens United* recognized that while preventing corruption or the appearance of corruption can justify expenditure restraints, that theory is not as broad as "influence over or access to elected officials" or a generic favoritism; rather, it can be justified only by a *quid pro quo* or cash-for-votes exchanges. *Citizens United,* 130 S.Ct. at 909–10 ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption."); *Thalheimer,* 645 F.3d at 1119 ("[T]he *Citizens United* decision had narrowed the scope of the anti-corruption rationale to cover quid pro quo corruption only, as opposed to money spent to obtain "influence over or access to elected officials." (citations and quotations omitted")). Recognizing the distinction be-

tween expenditure and contribution cases, some Courts have cautioned the expansion of the ruling outside the expenditure context, given the holding in *Citizens United* that independent expenditures—in contrast to contributions directly to candidates—do not corrupt as a matter of law. *See McNeilly v. Land,* 684 F.3d 611, 620 (6th Cir.2012) (publication forthcoming) ("[W]hile the Supreme Court in *Citizens United* held that the government has no anti-corruption interest in limiting independent expenditures, it left intact the government's interest in limiting *individual contributions* in order to prevent *quid pro quo* corruption or the appearance of such corruption."); *Ognibene,* 671 F.3d at 186–87 & n. 13; *see also SpeechNow.org v. Fed. Election Comm'n,* 599 F.3d 686, 695–96 (D.C.Cir. 2010) (discussing applicability of the *Citizens United* holding in contribution cases).

bution limits—is strongest when the state limits contributions made directly to political candidates." *N.C. Right to Life, Inc. v. Leake,* 525 F.3d 274, 291 (4th Cir.2008); *see also Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 696 (9th Cir.2010) (agreeing with the approaches of the D.C. and Fourth Circuits). Local and state elections, in particular, are more susceptible to the threat of corruption. *Ky. Right to Life, Inc. v. Terry,* 108 F.3d 637, 648–49 (6th Cir.1997).

One problem with the State's position in this case is that while preventing corruption and its appearance is a compelling state interest, the State fails to show either that a corruption concern prompted the legislature's enactment or that the limit now imposed furthers that anti-corrup-

tion interest in the manner prescribed here.[5] In *Shrink Missouri,* the Supreme Court stated that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." 528 U.S. at 390, 394–95, 120 S.Ct. 897. Responding to appellate decisions that had required the government to show a clear relationship between the amount of contributions and the corruption,[6] the Court noted that its decision in *Buckley* merely illustrated the *type* of evidence that courts may consider, not the *sufficiency* of the evidence. *Id.* at 391, 120 S.Ct. 897 (stating that "[w]hile *Buckley's* evidentiary showing exemplifies a sufficient justification for contribution limits, it does not speak to

**5.** The Court notes at the outset of the discussion of this interest that this action does not implicate the contribution limit available to other subsets of Florida's electorate and that the parties have taken the position that those amounts are constitutional. Thus, the Court's review is limited to whether the $100 cap applicable to minors is sufficient to prevent corruption while simultaneously allowing minors to still participate in the political process in a meaningful way. In this regard, the State contends that "large campaign contributions are, by their very nature, a significant factor in political corruption and that campaign contribution limits are a traditional, and approved method of limiting their corrupting influence." (Opp'n at 4.)

**6.** More specifically, the Eighth Circuit's decision in *Shrink Missouri* had required "some demonstrable evidence that there were genuine problems that resulted from contributions in greater amounts than the limits in place" and found, after applying a strict scrutiny level of review, that "the only evidence presented by the State, an affidavit from the cochairman of the state legislature's Interim Joint Committee on Campaign Finance Reform when the statute was passed, was inadequate to raise a genuine issue of material fact." *Shrink Missouri,* 528 U.S. at 383, 120 S.Ct. 897 (quoting lower court opinion). On appeal, the Supreme Court rejected the standard of review the Eighth Circuit had applied

(i.e., strict scrutiny instead of "closely drawn to match a sufficiently important interest") and considered additional evidence that had been presented to the district court—namely, "newspaper accounts of large contributions supporting inferences of impropriety." *Id.* at 386–88, 120 S.Ct. 897; *see also McConnell,* 540 U.S. at 137, 124 S.Ct. 619 ("[W]hen reviewing Congress' decision to enact contribution limits, there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny.' "). The Court did not specify the flaw that was responsible for its reversal, but rather found the entirety of the record sufficient to justify the statute under a closely drawn analysis. The Court recognizes that while the Supreme Court's decision in *Shrink Missouri* may undermine prior decisions of the Eighth Circuit that had applied that logic, those decisions have not been explicitly overruled and three of them of them are discussed below: *Carver v. Nixon,* 72 F.3d 633 (8th Cir.1995), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996), *Russell v. Burris,* 146 F.3d 563, 569–70 (8th Cir.), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 510, 142 L.Ed.2d 423 (1998), and *Day v. Holahan,* 34 F.3d 1356 (8th Cir.1994), *cert. denied,* 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995).

what may be necessary as a minimum."). It similarly distinguished its holding in *Colorado Republican Federal Campaign Committee v. Federal Election Commission,* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996)—which found that the government had failed to present evidence to show a real risk of corruption—by recognizing the difference between independent expenditure cases and contribution cases, noting that in the former there is no coordination between the candidate and the contribution's source. *Shrink Missouri,* 528 U.S. at 392, 120 S.Ct. 897.

In light of the record and precedent acknowledging the plausibility of a corruption theory, *Shrink Missouri* ultimately accepted the sufficiency of the state's evidence but did not set out any particularized standard. *Shrink Missouri,* 528 U.S. at 391–92, 120 S.Ct. 897 ("In any event, this case does not present a close call requiring further definition of whatever the State's evidentiary obligation may be ... Given the conflict [between the parties' evidence of academic studies regarding the effect of large contributions] ... there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters."). Nevertheless, *Shrink Missouri* should be read to provide meaningful guideposts for an inquiry in this regard. On the one hand, legislative bodies may be prompted by preventative considerations—that is preventing the appearance of corruption, instead of merely reacting to a current political scandal. *See id.* at 391–92 & n. 5, 120 S.Ct. 897 (parenthetically quoting authority). And they do not have to undertake an involved course of study before acting, so long as they perceive a problem to be remedied. *See id.* at 907–908 & n. 6, 120 S.Ct. 897 (parenthetically quoting *Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). In addition,

courts apply a lower threshold given the principle that contributions are causally linked to corruption and that contributions pose more of a corruption threat than expenditures. On the other hand, however, the Court also concluded that speculation on the part of the state is insufficient and that the threat of corruption must be more than "illusory." *Shrink Missouri,* 528 U.S. at 391–92, 120 S.Ct. 897. In this, the Court was clear: "[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden." *Id.* at 392, 120 S.Ct. 897.

A brief review of other cases more fully illustrates what might suffice to sustain the state's burden. For instance, in upholding a $1,000 individual contribution limitation, *Buckley* looked solely to "the Act's primary purpose" and "deeply disturbing examples" of *quid pro quo* corruption, which were found in the appellate court record that motivated the legislature to enact the legislation in question. *Buckley,* 424 U.S. at 26–27 & n. 28, 96 S.Ct. 612 (noting that instances were provided in the court of appeals decision). These examples—demonstrated by ample record evidence including congressional findings—included threats to legislators from special interest groups of cutting off funding and large contributions to the 1974 Congressional elections that were intended to "gain access to the elected official after the campaign for consideration of the contributor's particular concerns." *Buckley v. Valeo,* 519 F.2d 821, 838–39 (D.C.Cir.1975). Notably, in the absence of a legislative history (as is the case here), *Shrink Missouri* found sufficient an affidavit from the co-chair of the state legislature's campaign finance reform committee about the impact of large contributions. *Shrink Missouri,* 528 U.S. at 393, 120 S.Ct. 897. The Court also considered reports from state newspapers of "large contributions supporting inferences of impropriety" and the fact that

the measure was put to a state-wide vote and strongly supported by voters who recognized the need for the law. *Id.* (citing district court decision).

More recently, the Second Circuit found a sufficient corruption interest to support an outright ban on contractor contributions in Connecticut where the record included evidence of a scandal involving the award of government contracts that resulted in the governor's resignation and federal conviction, an event that was widely reported in the state. *Green Party,* 616 F.3d at 200. And in *Daggett v. Commission on Governmental Ethics and Election Practices,* 205 F.3d 445 (1st Cir.2000), the First Circuit considered the potential impact of individual and PAC contributions under prior limits, which could have provided a significant portion of a race's campaign funding. *Id.* at 456. It also received testimony from state politicians who spoke to the perception among the electorate that "politicians are beholden, or give special access, to those who give large amounts to their campaigns" and the experience among politicians of receiving varying amounts of contributions to their campaigns because of their prior votes. *Id.* Additionally, the state provided surveys of residents about their perception of the relation between large campaign contributions and political corruption. *Id.* at 457. Finally, the legislation at issue was approved by voter referendum. *Id.* at 458. The court in *Daggett* commented that this evidence "clearly surpasses the quantum of evidence offered and accepted as sufficient in *Shrink Missouri PAC* and would meet an even higher standard if one were applicable." *Id.* Thus, the statute imposing a $250 limit on contributions to state candidates was found to be constitutional.

Other cases where courts found a statute to be constitutionally infirm illustrate the lower limits of the spectrum. In *Carver v. Nixon,* the Eighth Circuit held that a Missouri law limiting individual contributions to between $100 and $300 (depending on the size of the voting district) was not sufficiently tailored to meet the state's interest. 72 F.3d at 642. It ruled that evidence of a scandal involving a large contribution by a political action committee to state races, as well as other examples "involv[ing] individual conduct leading to criminal prosecution," did not show that the law "will alleviate the harms in a direct and material way" and therefore could not justify such a small limit on individual contributions. *Id.* at 642–44 (citation omitted). Similarly, in *Russell v. Burris,* the defendants pointed out that a state representative accepted money from a group and subsequently introduced a bill that would favor its interests, but there was no evidence that the money was the cause of the bill's genesis or that the legislator concealed the source of the contributions for a corrupt purpose, real or perceived (particularly in light of the low contribution amount). 146 F.3d at 569–70. Accordingly, the Eighth Circuit held that "$1,000 is simply not a large enough sum of money to yield, of its own accord and without further evidence, a reasonable perception of undue influence or corruption." *Id.* at 569. In both cases, the Eighth Circuit compared the $1,000 limit approved in *Buckley* to the inflation-adjusted amounts at issue. *Carver,* 72 F.3d at 641; *Russell,* 146 F.3d at 570. Finally, as discussed in the following subsection, the district court decision in *McConnell,* which was upheld by the Supreme Court, found that four instances of parents' contributions through minors (among other evidence) was insufficient to sustain the government's burden.

While it is known that the statute in question was enacted in 1991, the record is devoid of any evidence regarding the process of its development. Similarly, as there is no legislative history, there is no

indication of what prompted the legislature—even if it was acting prophylactically in response to scandals in other states—or how it settled on the particular dollar limit it chose. The issue was never put to a state-wide vote and no residents were ever polled, so there is no evidence that the electorate was or is concerned with corruption involving minors.

Additionally, there is no evidence of the number or amount of contributions from minors before the statute was enacted (to show the impact of minor contributions), just as there is no evidence of the money involved in state elections overall (to show the amount necessary to gain influence). Accordingly, it cannot be said whether minor contributions would realistically cause corruption in the absence of the cap. And there is no evidence of post-enactment violations of the statute. So, while it could be that the statute is effective in deterring excessive contributions by minors, it also could be that the provision is unimportant to and unenforced by the State, or that corruption by minors is simply not a problem.

What evidence the State did present relating to minors is not specific to incidents occurring in Florida, but consists of anecdotal newspaper reports from other parts of the country. Again, this evidence post-dates the statute so that it could not have motivated the legislature. Finally, as acknowledged at oral argument, the remainder of the State's evidence speaks, at best, to corruption generally, but not corruption associated with large individual contributions from minors. For instance, there is no suggestion that politicians are motivated by money from contributions from minors and there is no evidence of a *quid pro quo* or vote buying scheme involving minors. In the end, whether the standard applied is complaisant or rigorous, and whether the evidence required is a scintilla or something more, the State has failed to meet its evidentiary burden.

Equally important, were the State able to show a compelling interest, there is insufficient information in the record to show that the restriction is sufficiently tailored to that interest. In *Day v. Holahan*, for instance, the Eighth Circuit invalidated a statute with a $100 limit to political committees as significantly impairing the First Amendment rights of contributors. 34 F.3d at 1365. The limit—the same amount as is at issue here—was "too low to allow meaningful participation in protected political speech and association," and the Court concluded that the law was "not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system." *Id.* at 1366. In *Randall*, a plurality of the Supreme Court held that a larger amount—a $200 to $300 contribution limit per candidate, per election—was not closely drawn because, among other things, the figure did not take into account the effects of inflation and the amount of the limit was the lowest in the country. 548 U.S. at 250, 126 S.Ct. 2479.

As regards this case, there is absolutely no evidence speaking to the influence of minors' contributions (gauged by comparing contributions before and after the implementation of the cap) or whether the limitation will allow them, in the aggregate, to express themselves. Thus, while the fact that this law involves a limit and not a ban, suggesting some effort to tailor the scope, that alone is insufficient to withstand a constitutional challenge. *See Green Party*, 616 F.3d at 204. Further, the statute not only limits contributions to individual candidates, but also to state political committees. *See N.C. Right to Life, Inc.*, 525 F.3d at 293 ("As the state attempts to regulate entities further and further removed from the candidate, the state

interest in preventing corruption necessarily decreases."). And it does not automatically adjust to counter the effects of inflation on the intensity of speech. *See Randall,* 548 U.S. at 261, 126 S.Ct. 2479.

### 2. Conduit Theory of Corruption

██ Apart from the corrupting influence of money in politics, another form of corruption raised by the State is a conduit theory, by which adults would funnel excess contributions through their unemancipated children. (Opp'n at 12 ("The evidence and authorities submitted establish that political corruption is endemic in Florida, that exceeding campaign contribution limits by utilizing conduits is common, both in Florida and elsewhere, and that using minor children as such conduits is common, although difficult to prove since the FEC does not require any record of the age of contributors.").) The Supreme Court applied similar reasoning in *Federal Election Commission v. Colorado Republican Federal Campaign Committee* when it held that some political organizations acting as intermediaries had the potential to funnel money to candidates on behalf of individuals, thereby frustrating the effect of contribution limits. 533 U.S. at 456, 121 S.Ct. 2351. Accordingly, the Court found that the threat posed by these potential intermediaries allowed the state to impose constraints on contributions by such organizations.

Yet precedent counsels that the State must go beyond simply identifying an interest to sustain its burden. In the only case where the Supreme Court spoke directly to this issue, *McConnell v. Federal Election Commission,* the Supreme Court invalidated a federal law, Section 318 of the Bipartisan Campaign Reform Act of 2002 (which added Section 324 of the Federal Election Campaign Act), which completely prohibited minors from contributing to candidates or political parties. The Court began at the same starting point as

this Court must: that is, the recognition that "[m]inors enjoy the protection of the First Amendment," and that contribution limitations "impinge on the protected freedoms of expression and association." *McConnell,* 540 U.S. at 231, 124 S.Ct. 619 (citations omitted); *see also Bluman v. Fed. Election Comm'n,* 800 F.Supp.2d 281, 290 (D.D.C.2011) (upholding federal law banning contributions by aliens who are not permanent residents, but noting that "many groups of people who are not entitled to vote may nonetheless make contributions and expenditures related to elections," which is justified by the fact that "minors, American corporations, and citizens of other states and municipalities are all members of the American political community."). Accordingly, the Court applied heightened scrutiny to analyze the government's interests in its treatment of minors. *McConnell,* 540 U.S. at 231, 124 S.Ct. 619. The Court noted the variable evidentiary threshold identified in *Shrink Missouri,* which adjusts to meet the justification. *Id.* at 232, 124 S.Ct. 619 (parenthetically quoting *Shrink Missouri,* 528 U.S. at 391, 120 S.Ct. 897). Then, reviewing the record, the Court found the evidence before it "scant" and insufficient to sustain the intrusion. *McConnell,* 540 U.S. at 232, 124 S.Ct. 619.

In *McConnell,* the underlying decision from the District Court for the District of Columbia considered a broader array of evidence than that presented to the Supreme Court, but also concluded that the government's interests were unsubstantiated. *See McConnell,* 540 U.S. at 232 n. 3, 124 S.Ct. 619 ("Although some examples were presented to the District Court, none were offered to this Court." (citation omitted)). In the case presented to Judge Kollar–Kotelly, the government adduced lawmakers' statements that campaign funds were solicited from individuals' family members. *McConnell v. Fed. Election*

*Comm'n,* 251 F.Supp.2d, 176, 718 (D.D.C. 2003). The government also proffered reports from the Federal Elections Committee and a United States Senate report, the latter of which noted "substantial evidence that minors are being used by their parents, or others, to circumvent the limits imposed on contributors." *Id.* at 588. Additionally, it cited fourteen newspaper articles describing instances of circumvention, including five of the six articles referenced in the student note the State presented to this Court in support of its position. *See id.* at 588–89. And of particular significance, the Federal Elections Commission uncovered four instances where funneling through minors had in fact occurred. *Id.* at 717–18.

The district court concluded that taken together this evidence may show that "the *threat* of circumvention in this manner exists" and that "the FEC and Congress have been concerned for many years with the potential for campaign finance abuses through the use of minors' contributions," but ultimately amounted to "minimal evidence" of corruption. *McConnell,* 251 F.Supp.2d at 717–18. (emphasis added). The Supreme Court affirmed that holding, commenting that "[a]bsent a more convincing case of the claimed evil, this interest is simply too attenuated for [the challenged statute] to withstand heightened scrutiny." *McConnell,* 540 U.S. at 232, 124 S.Ct. 619.

The record here is weaker than what was presented in *McConnell,* which found that larger quantum of evidence to be insufficient. *See McConnell,* 251 F.Supp.2d at 717 (stating, after reviewing the entirety of the record, that that evidence presented would be insufficient

"even if exacting scrutiny were applied to the present situation."). As discussed above, there is nothing in the record to indicate that the legislature considered the arguments raised by the State now. The populace has not expressed, through referendum or otherwise, concern about the threat of parental manipulation. There is no evidence of a large aggregate impact from excessive minor contributions. Further, there is no evidence that illegal parental conduit contributions present a real harm *in Florida.* Whatever can be said of the record, there is certainly no evidence that would justify such an austere limit on all minor contributions.

The only evidence particular to the State's conduit theory are newspaper articles providing anecdotes of funneling through minors. However, all but one of the articles cited by the State were considered and rejected as a basis in *McConnell.* The only additional article is no more probative. The State uses it to show that $12.2 million was contributed by "students" on a decennial basis *(see* Justice, *supra),* but as conceded by the State, that category is not limited to minors and may include students over 18 (or for that matter, octogenarians pursuing degrees).[7] Moreover, divided evenly among all 50 states, it results in $24,400 in contributions each year during the course of the decade. There is no record of the money available to Florida's candidates in general, and thus no basis for the Court to determine whether that small an amount is enough to buy votes or threaten corruption. Moreover, with respect to all of the articles and as mentioned above, the instances described happened long ago in other parts

---

7. The State asserts that it is "highly likely" both that the figure included underage students and that some money contributed was at the behest of their parents, but again is unable to point to competent proof. Similarly, while the Florida Supreme Court decision in *Brown* mentioned that the respondent fun-

neled money through his daughter, it did not suggest that she was a minor. Indeed, the fact that numerous other individuals involved in the scheme were unrelated to the respondent and apparently of age suggests that minors are not a common intermediary.

of the country and—presumably—in federal, not state, elections. Beyond that, at oral argument, the State conceded that it possessed no evidence of particular instances of parents funneling funds through minors in Florida elections.

Instead, the State argued that collecting such evidence would be "virtually impossible" given the difficulty of uncovering violations, owing to the family dynamic and the unlikely prospect of children cooperating in an investigation. But, as in *McConnell*, the difficulty of uncovering such evidence does not excuse the defendant's inability to adduce sufficient evidence given that constitutional rights are at stake. Judge Kollar–Kotelly accepted that the government's investigations were "perhaps" stymied by the refusal of parents to allow interviews, constitutional privacy concerns, and parental and legal counsel influence, but refused to relieve the government of its burden. *McConnell*, 251 F.Supp.2d at 717–18. Similarly, on review, the Supreme Court added that a possible cause for the lack of evidence might have been the successful deterrence of a complimentary law that acted to criminalize the use of another to make a political contribution—a law that is similar in substance to Section 106.08(5) of the Florida Statutes. *See McConnell*, 540 U.S. at 232, 124 S.Ct. 619.[8] Thus, the court found that the government had failed to come forward with sufficient evidence and that the law was unconstitutional. *Id.* Just as in *McConnell*, this Court cannot relieve the State of its burden, given the Supreme Court's mandate that such impingements of constitutional rights require a special justification.

It should be noted that the Court in *McConnell* also spoke to the breadth of the statute in considering whether it was closely drawn to meet the purported interest. Although the Court mentioned some of the different approaches taken by states—including limits—it went on to hold that that the ban at issue swept too broadly "[w]ithout deciding whether any of these alternatives is sufficiently tailored." *McConnell*, 540 U.S. at 232, 124 S.Ct. 619. As in *McConnell*, there is also reason to find that the Florida statute is too broad. While not a ban, *cf. Green Party*, 616 F.3d at 204, and while not the lowest cap in the Country, *cf. Randall*, 548 U.S. at 250, 126 S.Ct. 2479,[9] other states have adopted different approaches. For example, the majority of states that impose any sort of restriction on minor contributions—among them Arizona, Arkansas, California, Hawaii, Kansas, Michigan, Nebraska, Oklahoma, Rhode Island, South Carolina, and Texas—charge them to their parents' overall limit. ARIZ.REV.STAT. ANN. § 16–905(*l* )(3) (2006); ARK.CODE ANN. § 7–6–205(d) (West 2004) CAL. GOV.CODE § 85308(b) (West 2005); HAW.REV.STAT. § 11–359(a) (2011); KAN. STAT. ANN. § 25–4153(c) (West 2008); MICH. COMP. LAWS ANN. § 169.253 (West 2005); NEB.REV.STAT. § 49–1468(1) (2009); OKLA. STAT., titl. 21, § 187.1(A) (2011); R.I. GEN. LAWS § 17–25–10.1(f)(1) (West 2006); S.C.CODE ANN. § 8–13–1330 (2011); TEX. ELEC.CODE ANN.

---

8. Florida, through Section 106.08(5)(a), already prohibits "mak[ing] any contribution through or in the name of another, directly or indirectly, in any election." The State nevertheless insists that the legislation at issue is meant to prevent further funneling through children.

9. Three other states impose limits on minor contributions, which are lower than the limit in Florida (although they have not been subject to judicial challenge). In Connecticut, minors can contribute $30 while their adult counterparts can contribute between $250 and $5,000 depending on the position. *See* CONN. GEN. STAT. § 9–611(a)–(e) (2007). Massachusetts provides for a $25 limit. Mass. Ann. Laws ch. 55, § 7 (2007). Similarly, Kentucky prohibits candidates from accepting more than $100 from a minor. KY.REV.STAT. ANN. § 121.150(5) (2011).

§ 253.158(a) (West 2010). Ohio sets a lower age limit, prohibiting those under 7 from making a contribution, while adults can contribute up to $30,000 a year for a state political party. OHIO REV.CODE ANN. § 3517.102(B)(1)(a)-(c) (West 2005). And, as discussed earlier, one of the most narrow ways to tailor a statutory provision to guard against use of minors as conduits for contributors would be to criminalize that conduct, something that Florida already does (and, as shown by the consent decrees, enforces) through Section 105.08(5). *See* n. 8, *supra.* In sum, Florida's provision captures not only those minors who would be used as conduits, but also minors like Ms. Towbin who legitimately seek to express themselves. Accordingly, without more than is contained in the record, the Court cannot conclude that Florida's law is closely drawn.

### 3. Protection of Minors

■ Next, the State advances an argument premised on the state's long-rec-ognized right to protect the welfare of minors: "the comparative emotional immaturity of children means that, even if they are aware of and consent to donations made from their accounts or in their names, the likelihood that they are the subjects of undue influence which could not have been exerted on adults is substantially increased." (Opp'n at 9.) But the State does not proffer any evidence of that threat, much less identify the resulting harm with any degree of particularity—i.e., whether a child's independent funds will be the target of unscrupulous adults, political parties, or unknown others, causing him or her to lose large sums; or whether a child's political expression will be usurped, causing him or her to lose his or her voice and identity, etc. Nor does it identify any case anywhere recognizing such a justification for the type of intrusion at issue here—the contribution rights of minors.[10] Accordingly, such an assertion cannot stand as a

---

10. In some instances in First Amendment jurisprudence and beyond, courts have recognized that children may be subject to differential constitutional treatment vis-a-vis adults, a point that the State seizes on. Very broadly, in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), a four-justice plurality decision, the Supreme Court stated that three reasons justify "the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Id.* at 634, 99 S.Ct. 3035. But, rather than assuming that the state possesses any inherent authority to regulate children, the implication of *Bellotti* (which ultimately *invalidated* the law at issue) is that according minors unequal rights is *only* constitutional if those substantial interests support a distinction. *See generally Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 863–64 (4th Cir.1998) (discussing the *Bellotti* factors, noting that a law imposing differential treatment "would be unconstitutional if these interests did not provide sufficient support for broader authority to regulate minors," and analyzing precedent to conclude that "the government may sometimes, but not always, have interests in protecting minors that will allow it to impose special restrictions that narrow a minor's constitutional rights"). Moreover, the Court notes the irony regarding *Bellotti's* observations going to the rational for differential treatment—"the importance of the parental role in child rearing"—and the Court's recognition that minors' interests may be best served by deferring to the guidance of adults. *Bellotti*, 443 U.S. at 638–39, 99 S.Ct. 3035 ("Under the Constitution, the State can properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." (quotation omitted)). The Court has no reason to depart from the Supreme Court's explicit recognition in *McConnell* that minors enjoy a First Amendment right to make political contributions and that a law restricting even their rights requires a showing of special justification closely drawn to match that interest.

**1294**

sufficient justification, closely drawn to support the constitutional intrusion here.

### 4. Anti-distortion

 Finally, the State asserts that the law serves to prevent "minors that are financially well off [from having] greater first amendment rights than those that are poor" and professes an interest in "attempt[ing] to reduce this disparity in constitutional rights through the use of caps on campaign contributions by unemancipated minors" (Opp'n at 5–6). This argument, however, is easily disposed of as inconsistent with existing precedent. The anti-distortion view that caps "equalize the relative ability of all citizens to affect the outcome of elections" was first raised in *Buckley*, although it found the issue "unnecessary" to address given other justifications. 424 U.S. at 25–26, 96 S.Ct. 612. Some years later, the Supreme Court recognized the government's interest in combating "the corrosive and distorting effects of immense aggregations of wealth" in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), when it upheld restrictions on independent expenditures by corporations based on that theory.

But whatever persuasive hold an anti-distortion argument might have enjoyed

was short-lived. The *Citizens United* Court called the decision in *Austin* an "aberration," "not well reasoned" and "undermined by experience," and expressly overruled it insofar as an anti-distortion theory is no longer recognized as a viable government interest sufficient to justify limitations on political speech. *Citizens United*, 130 S.Ct. at 912–13. The Court concluded that individual speakers may "use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas." *Id.* at 905 (citing Justice Kennedy's dissenting opinion). The Court reached the same conclusion as recently as last year in *Bennett*, where it held that "[w]e have repeatedly rejected the argument that the government has a compelling state interest in 'leveling the playing field' that can justify undue burdens on political speech." 131 S.Ct. at 2825–26 (citation omitted). Accordingly, this Court will not consider an anti-distortion theory to justify the speech constraints implicated in this action.

### C. Other Preliminary Injunction Factors

 Having found a likelihood of success,[11] the Court briefly addresses the re-

---

Additionally, the State's proffered Eighth Amendment cases finding criminal sentences to violate the Constitution's prohibition of cruel and unusual punishment of minors—among them *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) and *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012)—recognize the comparative immaturity of minors apparently to protect them from overzealous *governmental authority* (i.e., not from themselves). Although it does not factor into the Court's analysis, the State's reliance on these cases does not give credence to the idea that the Court should defer to the State's assertion of an unspecified interest in protecting children from their parents.

11. Ordinarily, a party "is not required to prove his case in full at a preliminary-injunction hearing" and the purpose of such relief is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (citation omitted). Certainly—and in light of the parties' representations regarding the completeness of the record—Plaintiff is able to go beyond that showing, which has implications for this stage of the Court's analysis. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir.2010) ("We have even treated the merits as influencing our view of the relative severity of the harms."); *Bentley*, 788 F.Supp.2d at 1301 ("[W]here certain constitutional violations are claimed, including al-

maining factors for a preliminary injunction. In finding this action justiciable, the Court has already held that, if unconstitutional, the law already presents an irreparable harm. *See Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Specifically, the Court rejects the notion that Plaintiff is not entitled to an injunction either because her injury (a slight intrusion into her speech and associational rights) or its duration (based on the fact that she will soon be of age and able to contribute $500) are minimal. *See Miller v. City of Cincinnati,* 622 F.3d 524, 540 (6th Cir.2010) (affirming district court's grant of preliminary injunction regarding plaintiffs' use of city building to hold a press conference and rally and quoting precedent for the proposition that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."); *KH Outdoor, LLC,* 458 F.3d at 1272 ("[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury."). Further, injunctive relief is necessary because Plaintiff cannot be made whole by money damages and because the statute has chilling effect on the free speech and associational rights of Ms. Towbin and those similarly-situated. *See Scott,* 612 F.3d at 1295; *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990) (stating that "chilled free speech … [cannot] be compensated for by monetary damages").

The two remaining preliminary injunction factors are disposed of by the same rationale employed in the Court's analysis regarding the statute's unconstitutionality. *See KH Outdoor, LLC,* 458 F.3d at 1272–73 ("As for the third requirement for injunctive relief, the threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the city … the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance."). Thus, these factors weigh in favor of issuing an injunction.

Finally, Federal Rule of Civil Procedure 65(c) conditions the grant of a preliminary injunction on the movant's security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R.CIV.P. 65(c). A court has sound discretion in setting the amount of the bond. *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.,* 112 F.3d 1125, 1127 (11th Cir.1997). Indeed, the Eleventh Circuit has held that "the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 971 (11th Cir.2005) (quotation omitted). Because Defendants have not challenged Plaintiff's request that the Court not require a bond, and because there is no basis in the record to determine the amount of a reasonable bond, the Court will not require Plaintiff to provide such a security.

### III. CONCLUSION

In accordance with the foregoing, the Court will accordingly issue the least re-

---

leged violations of First Amendment rights, the irreparable injury, balance of the harms, and public interest inquiries collapse into the single question of whether the moving parties have established a substantial likelihood that they will ultimately prove the existence of the constitutional violation alleged.").

strictive injunctive relief by enjoining Defendants' enforcement of Section 106.08(1)(b)(2) of the Florida Statutes. An appropriate order and injunction consistent with these specific findings of fact and conclusions of law will be entered contemporaneously herewith.

### ORDER

**THIS MATTER** is before the Court on Plaintiff's Motion for a Preliminary Injunction (DE 5). Having considered the issues raised by the parties in their briefing and having held oral argument on the motion on July 12, 2012, and consistent with the Court's concurrently-issued findings of facts and conclusions of law, it is hereby **ORDERED AND ADJUDGED** as follows:

(1) Plaintiff has demonstrated entitlement to injunctive relief, insofar as Plaintiff has demonstrated a substantial likelihood that Section 106.08(1)(b)(2) unconstitutionally curtails her First Amendment rights of free speech and association, as well as those of others similarly-situated; Plaintiff has demonstrated irreparable injury will result in the absence of an injunction; Plaintiff has demonstrated that the threatened injury to Plaintiff outweighs any damage to each Defendant; and Plaintiff has demonstrated that an injunction would not be adverse to the public interest. Accordingly, Plaintiff's Motion for Preliminary Injunction (DE 5) is **GRANTED.**

(2) In order to ensure that the provision does not unconstitutionally impinge on the freedoms of speech and association, Defendant Peter Antonacci, in his official capacity as State Attorney for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida; Defendants Tim Holladay, Barbara A. Stern, Sean Hall, and Leslie Scott Jean–Bartin, Alia S. Faraj–Johnson, G. Gregory King, E. Leon Jacobs, Jr. and Brian M. Seymour, in their official capacities as Commissioners of the Florida Elections Commission; and Defendants' officials, employees, and attorneys, and all those in concert or participation with them and their successors, are **ENJOINED,** until further order from this Court, from enforcing, applying, implementing, requiring compliance with, or otherwise giving lawful effect to Section 106.08(1)(b)(2) of the Florida Statutes, which provides, to wit: "Notwithstanding the limits provided in this subsection, an unemancipated child under the age of 18 years of age may not make a contribution in excess of $100 to any candidate or to any political committee supporting one or more candidates." Fla. Stat. § 106.08(1)(b)(2).